**LAW OFFICES OF**
**JAMES V. BASHIAN, P.C.**
James V. Bashian, Esq.
70 Adams Street, 4th Floor
Hoboken, NJ 07030
Telephone: (973) 227-6330
Facsimile: (201) 488-3330

Attorney for Plaintiff
[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GARY MARCHESE, Individually, and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiff,<br><br>  -v-<br><br><br>CABLEVISION SYSTEMS CORPORATION, and CSC HOLDINGS, INC.<br><br>                       Defendants. | **CASE NO.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Electronically Filed** |

Plaintiff Gary Marchese, brings this action individually and on behalf of a Class (as defined below) of all others similarly situated in the state of New Jersey, against Defendants CableVision Systems Corporation and CSC Holdings, Inc. (collectively "CableVision" or "Defendants"), and alleges the following upon personal knowledge as to his own acts and upon information and belief as to all other matters.  Plaintiff's information and belief are based upon the investigation conducted by counsel.

**NATURE OF THE ACTION**

1.      Plaintiff Gary Marchese brings this action both individually and as a class action on behalf of the following class of persons (the "Class"): All persons in the state of

New Jersey who subscribed to CableVision's iO TV Package and paid a monthly rental fee to CableVision for a cable set-top box during the period April 29, 2004 to the present (the "Class Period").  Excluded from the Class are CableVision and its officers, directors, employees, affiliates and subsidiaries.

2.      Defendants provide cable television services to consumers in the New Jersey, New York and Connecticut tri-state areas.  Specifically, Defendants offer their premium cable television services in "iO TV" Packages, which include: (i) a broad range of digital channels and international programming; (ii) interactive services; (iii) pay-per-view ("Pay TV"); and (iv) Video on Demand ("on Demand") (the "iO TV Package").

3.      At all times relevant hereto, Defendants have been engaged in the illegal and anticompetitive practices alleged herein.  Defendants' illegal acts involve restricting the sources or outlets through which a cable set-top box can be acquired by Defendants' customers, and requiring their customers to use and rent the cable set-top boxes that are exclusively made available by Defendants at artificially inflated prices.  As detailed herein, Plaintiff and the Class have been injured by Defendants' illegal activities.

4.      While most television sets sold in the United States during the last decade have been sold "cable-ready," these television sets, standing alone without additional equipment, are only capable of receiving television signals broadcast by Defendants in an un-encrypted format.

5.      All of the television signals offered through a subscription to an iO TV Package are, however, only transmitted by Defendants in an encrypted format.  As a result, subscribers of an iO TV Package are required to obtain a separate piece of equipment from Defendants to receive and unscramble the encrypted television signals.

6.     Specifically, to decrypt these signals, Defendants require Plaintiff and members of the Class to rent and utilize cable set-top boxes that are exclusively distributed by Defendants.

7.     By tying the sale of a subscription to an iO TV Package to the rental and use of a cable set-top box distributed exclusively by Defendants, Defendants have abused their market power and substantially and unreasonably restrained competition in the market for the rental and sale of cable set-top boxes.

8.     By substantially and unreasonably restraining competition in the market for cable set-top boxes, Defendants have directly injured -- and continue to injure -- Plaintiff and members of the Class.   Absent Defendants' anticompetitive conduct, Plaintiff and members of the Class would have been -- and would be -- able to acquire cable set-top boxes at a cost substantially lower than the rental fees they are forced to pay to Defendants under the current anti-competitive market conditions caused by Defendants.

9.     Defendants' past and continuing actions of tying the sale of Defendants' iO TV Packages to the rental and use of the cable set-top boxes distributed exclusively by Defendants constitute an impermissible and unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act"), which caused injury to Plaintiff and the members of the Class, in violation of Section 4 of the Clayton Act, 15 U.S.C. § 15.   Defendants' misconduct has, and will continue to have, a substantial adverse competitive effect upon interstate commerce and has, and will, continue to inflict direct economic injury upon Plaintiff and members of the Class.

Defendants' tying arrangement has also violated the New Jersey state common law of unjust enrichment.

## THE PARTIES

10.     Plaintiff Gary Marchese, a resident of Passaic County, is, and at all relevant times was, a citizen of the State of New Jersey.  At all times relevant hereto, Plaintiff Marchese has subscribed to, and continues to subscribe to, an iO TV Package. Plaintiff Marchese pays Defendants $79.95 per month for his subscription to his iO TV Package.  In order to access all of the premium cable services available through his iO TV Package subscription, Plaintiff Marchese also pays Defendants an additional $20.10 per month for the rental and use of three cable set-top boxes ($6.70 per box).

11.     Defendant CableVision Systems Corporation is a Delaware corporation, with its principal place of business located at 1111 Stewart Avenue, Bethpage, New York 11714.  CableVision Systems Corporation owns all of the outstanding common stock of CSC Holdings, Inc. According to its website, www.cablevision.com, "Cablevision Systems Corporation is one of the nation's leading telecommunications and entertainment companies, with a portfolio of operations which includes a full suite of advanced digital television, voice and high-speed Internet services, publishing and interactive media, world-renowned entertainment showplaces, professional sports teams, and popular national and regional programming networks."

12.     Defendant CSC Holdings, Inc. ("CSC") is a Delaware corporation, with its principal place of business located at 1111 Stewart Avenue, Bethpage, New York 11714. CSC is a wholly owned subsidiary of CableVision Systems Corporation.  CSC operates

cable programming networks, entertainment businesses, telecommunications companies and a newspaper publishing business.

13.     CableVision Systems Corporation and CSC are collectively hereinafter referred to as "CableVision" or "Defendants."

## VENUE AND JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, in that Plaintiff, on his own behalf and on behalf of the Class, asserts claims under the Sherman Act, 15 U.S.C. § 1.  This Court has supplemental jurisdiction over the state law-based claims asserted herein pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this Court under 15 U.S.C. § 22 because CableVision transacts substantial business activity in this District.  Further, CableVision committed the illegal and anti-competitive acts complained of herein in this District.

## SUBSTANTIVE ALLEGATIONS

**CableVision And The Multi-Channel Video Programming Distribution Market**

16.     CableVision provides multi-channel video programming distribution ("MVPD") services to approximately 3.1 million video subscribers in the states of New Jersey, New York and Connecticut.  In the state of New Jersey alone, almost 950,000 consumers subscribe to CableVision. Approximately 94% of CableVision's 3.1 million subscribers subscribe to an iO TV Package.

17.     CableVision maintains economic control in the MVPD markets in which it operates because CableVision operates in densely populated geographic areas where it faces minimal, if any, competition from other MVPD providers.

18.     As set forth in greater detail below, CableVision has abused its market power in the MVPD cable markets in which it operates by tying the sale of its iO TV Packages to the rental and use of the cable set-top boxes that CableVision exclusively distributes.

**iO TV: The "Tying" Product**

19.     CableVision's cable programming is offered to consumers through a subscription to either "Broadcast Basic" or an iO TV Package.

20.     Broadcast Basic is an inexpensive, basic television channel package. The channels provided through a subscription to Broadcast Basic include, for example: Cablevision Channel Guide, My9 New York (MNT-WWOR), News 12 New Jersey, ShopNBC, WABC, WCBS, WFUT, WLIW, WLNY, WMBC, WNBC, WNET, WNJN, WNJU, WNYW, WPIX, WPXN, WRNN, and WXTV.

21.     Broadcast Basic channels are analog channels and are transmitted by CableVision in an unencrypted form.

22.     The iO TV Package includes all of the channels available through a subscription to Broadcast Basic and the following additional channels, which are broadcast in digital format: BBC World News, Bio, Bloomberg TV, Boomerang, CBS College Sports, Centric, CMT, C-SPAN3, Discovery Kids, Disney XD, ESPN Classic, ESPNews, ESPNU, EuroNews, FOX Business Network, FOX Movie Channel, FOX Soccer Channel, FOX Sports en Español, G4, The Golf Channel, Great American Country, Hallmark Channel, Hallmark Movie Channel, History International, Investigation Discovery, Jewelry Television, Logo, Military Channel, MLB Network, MTV Hits, MTV Tr3s, mun2, National Geographic Channel, NBA TV, New England

6

Cable News, Nicktoons Network, Nick Jr., Planet Green, Science Channel, ShopNBC, Style, TeenNick, VERSUS, VH1 Classic, VH1 Soul, and Wedding Central.

23.     Additionally, the iO TV Package includes the following digital enhancements: (i) international programming; (ii) interactive services; (iii) Pay TV; and (iv) on Demand.

24.     In order to access any of the channels available as part of a subscription to an iO Package, excluding the Broadcast Basic channels, or any of the enhancements, subscribers to an iO Package must rent and use a cable set top box, which is distributed exclusively by Defendants.

25.     Because a subscription to the iO TV Package requires a cable set-top box, an iO TV Package is the "tying" product.

**The Cable Set-Top Box: The "Tied" Product**

26.     Most television sets sold in the United States during the last decade are capable of receiving certain cable programs transmitted through a MVPD.  As a matter of pure technical capacity, such "cable-ready" televisions would allow customers to access many premium channels, including channels offered through a subscription to the iO TV Package.

27.     Despite the fact that most televisions are capable of accessing CableVision's iO TV digital signals, CableVision encrypts or "scrambles" its iO TV digital signals, rendering the iO TV digital signals unreadable without the use of a cable set-top box.

28.     Accordingly, CableVision iO TV subscribers must have cable set-top boxes, which they are required to rent through CableVision, in order to access any of the

iO TV digital enhancements, as well as the full range of channels available through the

iO TV Package.  CableVision states on its website:

> **A digital cable box or HD digital cable box is required for each television set to receive interactive services, certain digital channels and international programming, and seasonal sports packages.**

*See* http://optimum.custhelp.com/cgibin/optimum.cfg/php/enduser/std_adp.php?p_faqid=651&p_created=1087929552&p_sid=qtxp_zj&p_accessibility=0&p_redirect=&p_lva=&p_sp=cF9zcmNoPTEmcF9zb3J0X2J5PSZwX2dyaWRzb3J0PSZwX3Jvd19jbnQ9NDcsNDcmcF9wcm9kcz0mcF9jYXRzPSZwX3B2PSZwX2N2PSZwX3BhZ2U9MSZwX3NlYXJjaF90ZXh0PUNhYmxlQ2FyZA**&p_li=&p_topview=1 (last visited April 28, 2010).

29.     Because iO TV subscribers must rent a cable set-top box in order to access

any of the iO TV digital enhancements, as well as the full range of channels available

through the iO TV Package, the cable set-top box is the "tied" product.

30.     Cablevision charges iO TV subscribers a monthly fee to rent set-top boxes

from Cablevision in addition to the fee CableVision charges iO TV subscribers for their

iO TV Package.

31.     An iO TV Package, *i.e.*, the "tying" product, and the cable-set top box,

*i.e.*, the "tied" product, are separate and distinct products.

**CableVision Requires Class Members To Rent Cable Set-Top Boxes Distributed By CableVision, Creating An Anti-Competitive Market**

32.     CableVision has engaged in anti-competitive practices by restricting the

sources or outlets through which a cable set-top box can be acquired by its iO TV

subscribers.  Namely, CableVision requires that Class members rent and use the cable

set-top boxes distributed by CableVision, alone.

33.     By forcing consumers to rent and use the cable set-top boxes that

CableVision, alone, distributes, CableVision has successfully stifled competition in the

8

cable set-top box market and provided CableVision with monopoly power and/or substantial market power in the market for cable set-top boxes. In fact, because of CableVision's illegal tying policies, CableVision has a 100% share of the market for cable set-top boxes compatible with its iO TV Packages.

**CableVision Possesses Substantial**
**Economic Power And/Or Market Power In The Tying Market**

34.     As demonstrated here, CableVision has monopoly power and/or substantial market power in the market for comprehensive premium cable services.

35.     CableVision's substantial market power and/or economic control in the MVPD markets in which it operates is evidenced by the fact that approximately 2.9 million of CableVision's 3.1 million subscribers are iO TV Package subscribers. This represents nearly 94% of CableVision's customers, the highest digital penetration among MVPD digital cable providers in the nation.

   a.     **Cablevision's Ability To Regularly Increase The Total Number Of**
   **iO TV Subscribers While Raising Its Prices For Its Services**
   **Demonstrates Its Monopoly And/Or Substantial Market Power**

36.     CableVision's economic power and/or market power in the market for comprehensive premium cable services is evidenced by the fact that, even after increasing the price CableVision charges consumers for the iO TV Package, CableVision has not only retained a substantial number of iO TV subscribers, but has regularly increased the number of its iO TV subscribers. This is direct evidence of CableVision's substantial economic power and/or market power.

37.     From December 2006 through the end of the Fourth Quarter of 2007, the total number of subscribers to an iO TV Package increased by 181,000, or 7.4%.  From December 2007 to the end of the Fourth Quarter of 2008 the total number of subscribers

to the iO TV Package increased by approximately 208,000, or 7.9%. Further, from December 2008 to the end of the Fourth Quarter of 2009, the total number of iO TV subscribers increased by 56,000, or 2.0%.

38.     Indeed, in 2010, CableVision also raised its prices for its cable services by 3.7% for the 3.1 million customers in New Jersey, New York and Connecticut.

39.     Accordingly, CableVision has been able to continuously increase its total revenue generating units (RGUs), which includes revenue from subscriptions to Broadcast Basic, the iO TV Package, as well as CableVision's internet and phone services. CableVision's total RGUs increased 653,400 for the year ended December 31, 2008. For the year ended December 31, 2009, CableVision added 297,700 RGUs, with the increase resulting primarily from the greater number of iO TV Package subscribers.

**b.     CableVision Has Achieved Dominance Over Satellite
     MVPD Providers In The MVPD Markets In Which It Operates**

40.     Premium cable services may be transmitted through an MVPD cable or MVPD satellite provider. Studies have shown, however, that MVPD cable providers dominate the MVPD market. Significantly, a 2007 Congressional report found that of the 94.2 million households that subscribe to an MVPD, 69.4% of the MVPDs are provided through video programming from a franchised cable operator, whereas only 27.7% come from a direct broadcast satellite.

41.     MVPD cable providers, like CableVision, have been able to achieve this dominance by use of the following techniques or strategies.

42.     First, MVPD cable providers, like CableVision, have employed a strategy of "clustering" - swapping, partnering and buying up subscribers in geographically

consolidated areas, areas in which MVPD satellite providers, as a matter of technology, are not capable of operating.

43.     As a result of this "clustering" approach, MVPD cable service providers dominate over MVPD satellite service in geographically concentrated areas.  This market dominance, in turn, attracts local broadcasting stations looking to reach the largest number of customers possible.

44.     Second, MVPD cable providers, like CableVision, "bundle" their products – *i.e.*, provide customers with broadband internet access and phone service over the same cable infrastructure that they provide customers with video cable service.  Satellite MVPD providers are not technologically capable of "bundling" products.

45.     Finally, MVPD cable providers, like CableVision, provide more popular programming options than MVPD satellite providers.  MVPD cable providers, like CableVision, obtained the right to provide these popular programming options pursuant to programmer-distributor contracts which were executed in the 1990s, long before any MVPD satellite providers existed.

46.     As a result of the foregoing, CableVision has been able to establish dominance over MVPD satellite providers in the MVPD market.  Furthermore, as a result of the foregoing, CableVision has been able to establish itself as the most highly penetrated digital cable service provider in the nation.

   c.     **There Are Significant Barriers Preventing Potential Competitors From Entering The MVPD Cable Market**

47.     "Overbuilders," entities that utilize/build on an existing MVPD cable provider's network in order to offer customers an alternative cable service, have attempted to enter the cable market without much success.

48.     These aspiring overbuilders have had difficulty successfully entering the cable market due to the existence of significant entry barriers, including the enormous costs associated with building and maintaining a broadband network infrastructure.

49.     As a condition to entering the premium cable service industry, overbuilders must be able to invest significant capital expenditures on broadband and fiber optic networks, which, according to the National Cable & Telecommunications Association totaled approximately $12.4 billion in 2006 and $13.7 billion in 2007.

50.     Additionally, the ability of overbuilders to price their MVPD services at the level necessary to recover these initial expenses is exceedingly low and constrained by the presence of incumbent MVPD cable providers, like CableVision, who can provide premium cable services at a much lower cost and still reap profits.  Consequently, overbuilders have been less successful in keeping pace with the broadband technological advances.

51.     An additional barrier to entry into the MVPD cable market is the franchising process by which overbuilders receive permission to build a wireline network, or franchise, in a particular area.

52.     In some areas, the application process for a wireline network is costly and can take up to three years to complete. As a result, overbuilders are often deterred from entering the MVPD cable market due to this lengthy process.

53.     As a result of the foregoing, significant barriers prevent entrance into the MVPD cable market.

**CableVision's Illegal Tying Arrangement Affects A Substantial Amount**
**Of Commerce In The Market For Cable Set-Top Boxes**

54.    Absent the anticompetitive and exclusionary practices alleged above, other outlets for cable set-top boxes compatible with CableVision's iO TV Packages, including electronics manufacturers and retail outlets, would have successfully entered the cable set-top box market, and would have been viable competitors to CableVision in the cable set-top box market.  Such competition would have resulted in more choices and lower prices for consumers, including Plaintiff and members of the Class.

55.    CableVision's practice of forcing consumers to rent the cable set-top boxes that it distributes has prevented electronics manufacturers and retail outlets from selling or renting cable set-top boxes directly to CableVision iO TV subscribers.

56.    By preventing electronics manufacturers and retail outlets from selling or renting cable set-top boxes directly to CableVision iO TV subscribers, CableVision has affected competitors' total volume of sales of cable set-top boxes by a more than de minimis amount in absolute dollars.

57.    If not for CableVision's illegal tying arrangements, cable set-top box direct manufacturers and retail outlets would have had greater success entering the cable set-top box market.

**CableVision's Tying Arrangement Has Caused Harm To iO TV Subscribers**

58.    Plaintiff and members of the Class purchased premium cable through a subscription to CableVision's iO TV Package.

59.     CableVision's iO TV subscribers are required to use and rent the cable set-top boxes that CableVision distributes in order to have access to the full range of

services available through a subscription to the iO TV Package, including the two-way interactive services that they have purchased as part of their subscription.

60.     iO TV subscribers are forbidden from renting or purchasing a cable set-top box from anyone other than CableVision, including any direct cable set-top box manufacturer, retail outlet or second-hand distributor.

61.     Subscribers who try to get around this restriction by obtaining a cable set-top box from a source other than CableVision, will get a worthless box.  For example, a customer who obtains used or refurbished cable set-top boxes available on "eBay" will be unable to access CableVision's premium cable services because the cable set-top boxes are not compatible with the services offered by CableVision.  The reason those cable set-top boxes do not function on CableVision's cable MVPD system is not because they lack a critical technology over which CableVision has sole control, as all set-top boxes utilize the same basic technology components.  Rather, CableVision either instructs its cable MVPD system not to acknowledge those cable set-top boxes, or its cable MVPD system uses specific software and CableVision refuses to download that software onto cable set-top boxes that it does not distribute.

62.     CableVision charges considerable fees per month to Plaintiff and members of the Class for each cable set-top box that it distributes.  The price which CableVision charges Plaintiff and members of the Class for the use and rental of its cable set-top boxes far exceeds the price they would have paid to acquire cable set-top boxes in a competitive market which would have existed absent CableVision's illegal and anticompetitive conduct. Although the amount of the overcharges incurred by Plaintiff and members of the Class (and the amount of money CableVision illegally earned) from

14

this conduct cannot be determined without discovery, the amounts of overcharges and ill-gotten profits caused by CableVision's conduct are quite substantial, as Plaintiff and members of the Class have incurred overcharges on millions of cable set-top boxes during the Class Period.

63.     CableVision's illegal tying arrangement has also harmed Plaintiff and members of the Class by limiting consumer choice and dampening competition and innovation in the cable set-top box market.

**The CableCARD Is Not A Viable Substitute To The Cable Set-Top Box**

64.     CableVision, in a purported attempt to offer  consumers "choices" in the types of decoding equipment available to them, has provided consumers with the ability to use and rent the CableCARDs (as defined herein) that it distributes.

65.     While CableCARDs perform security functions similar to cable set-top boxes, CableCARDS are, by definition, not substitutes for cable set-top boxes because, as explained in more detail below, they do not perform two-way communication, and thus do not allow premium cable subscribers to access valuable premium cable services that they have purchased.

66.     CableVision currently provides its consumers with the "choice" between two types of CableCARDs: Multi-stream (the "M-Card") and Single-stream (the "S-Card) (collectively the "CableCARD").  M-Cards process multiple video streams, thereby enabling the compatible device to simultaneously display and record programs, as well as display picture-in-picture images.  The S-Cards, by contrast, can only process single video streams.

67.     Unlike a cable set-top box, which performs the unscrambling and decrypting on its own, a CableCARD must be inserted into a separate compatible device, where the CableCARD can then perform its unscrambling and decrypting functions.

68.     There are only a limited number of consumer electronic devices that support M-Card capabilities, including Tivo, HD and DVR.  The S-Card is compatible with all M-Card compatible devices, in addition to HDTV, Moxi HD and PC TV tuners, which only operate in single-stream mode.  While the M-Card can be inserted into the additional S-Card compatible devices, it can only operate in single-stream mode.

69.     The CableCARD is unable to provide all of the same services that a cable set-top box can, and are thus limited with respect to interactive features.

70.     CableVision discusses the limited features of the CableCARD on its website, informing consumers that certain iO TV services are not available through use of a CableCARD.  Specifically, CableVision states:

> The following digital services are not currently available with your CableCARD device:
>
> o  Video on Demand
> o  iO interactive program guide
> o  iO games
> o  Ability to order Pay Per View events using your remote.
>
> **A digital cable box is required** to receive these features.

*See* Exhibit A, attached hereto.  (Emphasis added).

71.     The CableCARD also does not have the same switched digital video technology services as a cable set-top box.

72.     Switched digital video technology is an advanced interactive technology, which CableVision uses to transmit digital video signals through consumers' television

sets.  The digital video signals enable CableVision to provide consumers with a more expansive selection of programming and interactive functions.  These programming options include the following: (i) subscription international programming, including iO Español, iO Russian, iO Korean; (ii) subscription sports packages, including MLB Extra Innings, NBA League Pass, NHL Center Ice, etc; (iii) NHL Network HD; (iv) Big Ten Network and Big Ten Network HD; and (v) limited premium HD movie channels.  *See* Exhibit A, attached hereto.

73.     The CableCARD's inability to provide the same interactive features and switched digital video programming options as a cable set-top box prevents a CableCARD from acting as an adequate substitutes for a cable set-top box.

74.     The CableCARD's inability to act as a substitute for a cable set-top box is also evidenced by the very small number of CableCARDs that consumers rent from CableVision.  Although CableVision has approximately 2.9 million iO TV subscribers, as of March 13, 2009, CableVision only had 17,908 subscribers who used and rented its CableCARDs.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff Gary Marchese brings this action both individually and as a class action on behalf of the following class of persons (the "Class"): All persons in the state of New Jersey who subscribed to CableVision's iO TV Package and paid a monthly rental fee to CableVision for a cable set-top box during the period April 29, 2004 to the present (the "Class Period"). Excluded from the Class are CableVision and its officers, directors, employees, affiliates and subsidiaries.

76. Members of the Class are so numerous that joinder of all members would be impracticable. Plaintiff estimates that there are millions of purchasers of the iO TV Package overall and at least hundreds of thousands in New Jersey, the exact number of which is within documents in Defendants' custody and control and can be obtained through discovery.

77. There are questions of law and fact common to all the members of the Class that predominate over any questions affecting only individual members, including:

a. Whether Defendants violated Section 1 of the Sherman Act 15 U.S.C. §1 by tying the sale of the iO TV Package to the rental of their cable set-top boxes, thereby creating an anti-competitive cable set-top box market and ultimately causing harm to Plaintiff and members of the Class;

b. Whether Defendants were unjustly enriched by accepting or retaining non-gratuitous benefits conferred by Plaintiff and members of the Class despite Defendants' knowledge that the tying of a cable set-top box to the sale of their iO TV subscription was unlawful;

c. Whether Defendants should be enjoined from further violations of federal laws; and

d. Whether, as a result of Defendants' misconduct, Plaintiff and members of the Class are entitled to damages as a result of Defendants' violation of federal antitrust laws, and the proper measure of such damages.

78. The claims of Plaintiff are typical of the claims of members of the Class. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

18

79.     Plaintiff will fairly and adequately protect the interests of members of the Class, and has retained attorneys experienced in class and complex litigation.

80.     A class action is superior to all other available methods for this controversy because:

a.     The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

b.     The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants;

c.     Defendants acted or refused to act on grounds generally applicable to the Class; and

d.     Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

81.     Plaintiff does not anticipate any difficulty in the management of this litigation.

## COUNT I

### (By Plaintiff Marchese, Individually And On Behalf Of All Members Of The Class, For Violation Of Section 1 Of The Sherman Act - Unlawful Tying)

82.     Plaintiff Marchese hereby incorporates by reference all allegations contained in the preceding paragraphs.

83.     The Sherman Act makes it unlawful to enter into a contract in restraint of trade or commerce.  15 U.S.C. § 1.  Congress has granted a private right of action to individuals harmed by violations of this act.  15 U.S.C.  § 15.

84.     Plaintiff, on his own behalf and on behalf of members of the Class, seeks to recover damages he suffered as a result of Defendants' violations of the Sherman Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

85.     Defendants have illegally sold comprehensive premium cable services, the tying product, upon the condition that consumers use and rent their cable set-top boxes, the tied product.  As detailed above, Defendants affected the tie by forcing subscribers of the iO TV Package to rent their cable set-top boxes from CableVision in order to have access to all of the iO TV Package services and channels.  For each cable set-top box that members of the Class obtain from Defendants, they are also forced to pay rental fees.

86.     Plaintiff and members of the Class cannot untie their subscription to the iO TV Package from their use and rental of a cable set-top box.

87.     The iO TV Package is a separate and distinct product from a cable set-top box.  Likewise, the market for provision of comprehensive premium cable services, such as the iO TV Package, and the market for cable set-top boxes, are separate and distinct.

88.     Defendants have sufficient economic power in the MVPD cable market to enforce the illegal tie and force consumers to accept burdensome terms that could not be

exacted in a competitive market.  Defendants illegally restrained consumers from renting or purchasing cable set-top boxes from other sources thereby creating an anti-competitive market.

89.     Defendants' improper tying arrangement prevents manufacturers and retailers of cable set-top boxes from effectively entering the cable set-top market and has thereby harmed competition.

90.     Defendants' conduct substantially affects interstate commerce by limiting the market for cable set-top boxes in the areas where CableVision operates.  Plaintiff and members of the Class have been damaged by Defendants' actions because they have been forced to spend more money for rental of the cable set-top boxes distributed by Defendants than they would otherwise have spent for the purchase or rental of a cable set-top box absent Defendants' illegal and anticompetitive conduct.

91.     Defendants' tying arrangement unreasonably restrains trade in violation of Section 1 of the Sherman Act.

## COUNT II

### (By Plaintiff Marchese, Individually, And On Behalf Of All Members Of The Class For Violation Of The New Jersey Common Law Doctrine Of Unjust Enrichment)

92.     Plaintiff Marchese repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

93.     Plaintiff Marchese and members of the Class have paid (and continue to pay) their iO TV subscription bills in the state of New Jersey.  Because their transactions occurred in the state of New Jersey, the New Jersey common law doctrine of unjust

enrichment is applicable to the claims of Plaintiff Marchese and all members of the Class pursuant to this Count.

94.     As demonstrated herein, at all relevant times, Defendants were unjustly enriched by (i) illegally tying the sale of the iO TV Package to the use and rental of Defendants' cable set-top boxes, and (ii) requiring Plaintiff Marchese and members of the Class to use and rent the cable set-top boxes that Defendants distributed.

95.     As a result of Defendants' actions, Plaintiff Marchese and members of the Class have unknowingly conferred upon Defendants excessive payments for the rental of Defendants' cable set-top boxes; benefits which were non-gratuitous and constituted "profits."

96.     Defendants retained these non-gratuitous and excessive benefits from Plaintiff and members of the Class.  The retention of these benefits by the Defendants was unjust because Defendants accepted the payments with knowledge that the tying of cable set-top box to the sale and use of their iO TV packages was unlawful.

97.     As a result of Defendants' scheme, Defendants reaped millions of dollars in illicit profits.

98.     The unjust and inequitable retention of these benefits by Defendants derived from their illegal tying arrangement violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff and members of the Class in a manner established by this Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court:

a.      Certify this action as a class action under Rule 23, appoint Plaintiff as representative of the Class alleged herein, and appoint the law firms representing Plaintiff as counsel for the Class;

b.      Issue an Order that Defendants have violated Section 1 of the Sherman Act and Sections 4 of the Clayton Act, as alleged herein;

c.      Order Defendants to pay Plaintiff and members of the Class treble damages and restitution in amounts to be determined at trial;

d.      Issue an injunction preventing Defendants from continuing to tie the sale of the iO TV package to the use and rental of their cable set-top boxes;

e.      Issue an order granting Plaintiff reasonable costs and attorneys' fees; and

f.      Grant such other relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

99.     Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated: April 29, 2010

By: /s/James V. Bashian
James V. Bashian, Esq.
**LAW OFFICES OF**
**JAMES V. BASHIAN, P.C.**
70 Adams Street, 4th Floor
Hoboken, NJ 07030
Tel: 973-227-6330
Fax: 201-488-3330

**HORWITZ, HORWITZ & PARADIS,**
**Attorneys at Law**
Paul O. Paradis, Esq.
Gina M. Tufaro, Esq.
Amanda K. Stein, Esq.
405 Lexington Avenue, 61st Floor
New York, NY 10174
Tel: 212-986-4500
Fax: 212-986-4501

**LAW OFFICES OF JAY P. SALTZMAN**
Jay P. Saltzman, Esq.
19 Fulton St., Suite 407
New York, NY 10038
Tel: 212-204-5676
Fax: 212-267-8137

**TAUS, CEBULASH & LANDAU, LLP**
Barry S. Taus, Esq.
Brett Cebulash, Esq.
Kevin S. Landau, Esq.
1515 Broadway, 11th Floor
New York, NY 10036
Tel: 212-520-4310