**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARY MARCHESE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABLEVISION SYSTEMS CORPORATION, and CSC HOLDINGS, INC.,<br><br>Defendants. | Civil Action No.: 10-2190 (JLL)<br><br><br>**OPINION** |

     This matter comes before this Court by way of Defendant Cablevision Systems Corporation ("Defendant" or "Cablevision")'s Motion to Dismiss Plaintiffs' Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [Docket Entry No. 63]. The matter arises out of allegations that Cablevision employs an illegal tying arrangement in which it uses its market power to require its subscribers to rent cable boxes as a condition of subscribing to Cablevision's "Two Way Services," as defined herein, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and various state common law prohibitions of unjust enrichment. The Court has considered the submissions made in support of and in opposition to the instant motion. No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND

     This case arises out of Plaintiffs' allegations that Cablevision engaged in an illegal restraint on trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, by forcing customers

to rent a set-top cable box in order to receive Cablevision's Two Way Services.  Cablevision's

Two Way Services allow two-way communication between a subscriber and accessible services

through a remote control, said services including: (1) interactive services (including the

interactive program guide); (2) pay-per-view ("Pay TV"); (3) Video on Demand ("on Demand");

and (4) iO Games.  (Third Am. Compl., ¶¶ 2, 41).  Plaintiffs argue that consumers are unable to

purchase alternative access to said Two Way Services in the relevant geographic market of the

New York, New Jersey and Connecticut from either Cablevision or on the open market and thus

claim that Cablevision has impermissibly tied its Two Way Services to its own proprietary cable

box.  Plaintiffs also allege that Cablevision unlawfully monopolized the market for the

distribution of set-top boxes providing access to Two Way Services in the relevant geographic

market in violation of § 2 of the Sherman Act.  (Id., ¶ 19).  A complete recitation of the facts of

the case can be found in this Court's three opinions dismissing Plaintiffs' Original and two

Amended Complaints, entered respectively on August 18, 2010 [Docket Entry No. 31], January

14, 2011 [Docket Entry No. 45] and July 21, 2011 [Docket Entry No. 57], and are incorporated

herein by reference.

## II.  LEGAL STANDARD

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court is

"required to accept as true all factual allegations in the complaint and draw all inferences from

the facts alleged in the light most favorable" to the plaintiff.  Phillips v. County of Allegheny,

515 F.3d 224, 228 (3d Cir. 2008); see also Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1995, 1965

(2007).  "However, a court need not credit either 'bald assertions' or 'legal conclusions' in a

complaint when deciding a motion to dismiss."  Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir.

2005).  A complaint survives a Rule 12(b)(6) motion to dismiss if it states a claim to relief that

is "plausible on its face" regarding plaintiff's entitlement to the relief sought. Twombly, 127

S.Ct. at 1965-66. This standard is satisfied only when a plaintiff "pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

### III.  DISCUSSION

.      Plaintiffs allege that Defendant Cablevision's policy requiring subscribers to Two Way

Services to rent cable boxes from Cablevision in order to receive said services constitutes an

illegal tying scheme in violation of § 1 of the Sherman Act, and, further, that Cablevision

unlawfully monopolized the market of set-top box distribution in violation of § 2 of the Sherman

Act. The Court will address each of Plaintiffs' claims in turn.

### 1) Plaintiffs' § 1 Tying Claim – *Per Se* Analysis

A tying arrangement is an arrangement in which "the seller sells one item, known as the

tying product, on the condition that the buyer also purchases anther item, known as the tied

product." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir.

1997)(citing Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 200 (3d

Cir. 1994)). In order to make out a § 1 per se tying claim, a plaintiff must appropriately allege

facts indicating: (1) a defendant seller tied two distinct products, conditioning sale of one product

on the purchase of a different tied product; (2) the seller possesses market power in the tying

product market; and (3) a substantial amount of interstate commerce is affected. Town Sound

and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 477 (3d Cir. 1992); see also

SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 n.3 (3d Cir. 1978); Jefferson Parish

Hospital District No. 2 v. Hyde, 466 U.S. 2, 9-10 (1984)("Jefferson Parish"). For the following

reasons, the Court finds that Plaintiffs have sufficiently alleged facts stating a § 1 per se tying claim. Defendant's Motion to Dismiss Plaintiffs' said claim is therefore denied.

### A. Separate Tying and Tied Products

"The first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination precisely what the tying and tied products markets are." Queen City Pizza, 124 F.3d at 443 (citing Allen-Myland, 33 F.3d at 200-201). In order to state a Sherman Act claim under § 1, a plaintiff "must identify the relevant product and geographic markets." Id., at 435. The Court finds that Plaintiffs have alleged sufficient facts regarding valid distinct products markets within the designated geographic market to support this first element of a per se tying claim.

#### i. Relevant Geographic Market of the Tying and Tied Products.

Plaintiffs' Third Amended Complaint limits the relevant geographic market to the area in New York, New Jersey and Connecticut in which Cablevision operates, designating said area as the "New York designated market area ('DMA')." (Third Am. Compl., ¶¶ 4, 118). Defendant makes three arguments against the validity of Plaintiffs' alleged geographic market. (Def. Br., at 16). First, Defendant argues that the proposed geographic market is too vague in that it neither delineates a specific geographic area nor identifies which areas within the tri-state area were inside or outside the relevant Two Way Services market during the class period. (Def. Br., at 16-17). Second, Defendant claims that the New York DMA violates the principle articulated in Third Circuit law which circumscribes the relevant geographic market to "the area in which a potential buyer may rationally look for the goods or services he or she seeks." Pennsylvania Dental Ass'n v. Medical Serv. Ass'n, 745 F.2d 248, 260 (3d Cir. 1984). Specifically, Defendant

asserts, Plaintiffs concede that competitive conditions varied within the New York DMA in that Verizon in New Jersey and New York and AT&T in Connecticut offered two-way services in certain areas in which Cablevision operated, but the Third Amended Complaint does not narrow the geographic market to take into account such variations. (Def. Br., at 17-19). Third, Defendant contends that Plaintiffs have it backwards in attempting to define Cablevision's geographic market based on its market share dominance in a particular area rather than defining the market first, based on where consumers may turn for the relevant product. (Def. Br., at 19-20).

The geographic market selected by a Plaintiffs must "correspond to the commercial realities of the industry and be economically significant." Brown Shoe v. United States, 370 U.S. 294, 336-37 (1962). "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." Id., at 336. Courts generally measure

> a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product. This approach evaluates the geographic aspect of the elasticity of a specified market–that is, how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location.

Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006)(citations omitted); see also Atl. Exposition Servs. v. SMG, 262 Fed. Appx. 449, 452 (3d Cir. 2008). Courts have also held that "the market for certain entertainment services . . . is local or regional." Heerwagen, 435 F.3d at 228 (collecting cases); see also Houser v. Fox Theatres Management, Corp., 845 F.2d 1225, 1230 & n. 10 (determining the movie ticket market based on how far theatergoers travel to see movies). For per se claims, "plaintiffs need not establish a geographic market." Behrend v. Comcast Corp., 655 F.3d 182, 192 (3d Cir. 2011); see also In re Ins.

Brokerage Antitrust Litig., 618 F.3d 300, 316-317 (3d Cir. 2010)(explaining that some prohibited practices can be conclusively presumed to unreasonably restrain competition). Further, "[d]efining the relevant geographic market . . . is an issue of the merits." Behrend, 655 F.3d at 192; see also Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307 (3d Cir. 1982)(addressing on appeal whether a jury verdict should be set aside because of allegedly erroneous definition of the relevant geographic market and finding that the relevant geographic market was a jury question).

Defendant's arguments regarding Plaintiffs' definition of the relevant geographic market are unpersuasive at this stage of the pleadings. Most importantly, since the relevant geographic market "is a component of substantive antitrust law" to be determined on the merits as a jury question, the Court finds that the New York DMA is a relevant geographic market susceptible to proof at trial through available evidence common to the class. See Behrend, 655 F.3d at 192.

To the extent that Defendant seeks to dismiss Plaintiffs' tying claim under a rule of reason analysis, the Court is still not convinced of the invalidity of the relevant geographic market at this stage. Defendant's first argument regarding the vagueness of the New York DMA is not supported by the case law. Defendant cites Mathias v. Daily News, L.P., to support its assertion that the "tri-state area" is too vague of a geographic market to survive a motion to dismiss. (Def. Br., at 17). In Mathias, delivery firms claimed, inter alia, that a newspaper publisher, the Daily News, conspired with others to force the delivery firms to purchase the News from the defendant publisher at unreasonably high prices, amounting to a "systematic exclusion" of the delivery firms from the home delivery business. 152 F. Supp. 2d 465, 477-83 (S.D.N.Y. 2001). However, the Mathias court located the vagueness of plaintiffs' definition of the relevant geographic market not in the breadth of the "tri-state area" market, but rather in the

contradictory and imprecise nature of the plaintiffs' shifting definition of the relevant market between the broader national market and the narrower "tri-state area" market. Plaintiffs assert no such contradictory or vague market here, narrowing the scope of the market to those areas of the New York DMA in which Cablevision operates.

Further, the relevant geographic market is "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies," in other words, the area in which suppliers "effectively compete." Behrend, 655 F.3d at 193. In view of the realities of the multichannel video programming distributor ("MVPD") industry, defining the relevant geographic market as the clustered service area in which an individual distributor operates accords with reports issued by the Federal Communications Commission ("FCC") and other district courts' consideration of the issue. First, in its examination of the commercial realities of the industry of MVPDs, of which Cablevision is a participant, the FCC aggregated relevant geographic markets in which customers face similar competitive choices, noting in its 2009 Annual Report that "[c]able operators continue to pursue a regional strategy of 'clustering' their systems." (Def. Mot. to Dismiss, Decl. of Jakob B. Halpern ("Halpern Decl."), Ex. 6, "FCC Thirteenth Annual Report of 2009" ("FCC 2009 Report"), at ¶ 180). Further, at least five federal district courts that have considered antitrust claims against MVPDs for alleged tying with set-top boxes have determined that the relevant geographic market consists in the service area of the cable companies. See In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation, 2010 U.S. Dist. LEXIS 58417, at * 20-21 (W.D. Okla. Jan. 19, 2010); Parsons v. Bright House Networks, 2010 U.S. Dist. LEXIS 55277, at * 20-21 (N.D. Ala. Feb. 23, 2010); Bodet, Jr. v. Charter Communications, Inc., 2010 U.S. Dist. LEXIS 87088, at *8, 17-18 (E.D. La. July 26, 2010); Downs v. Insight Communications Company, 2011 U.S. Dist. LEXIS 29616,

at * 10-11 (W.D. Ky. Mar. 22, 2011); In re Time Warner Set-Top Cable Television Box Antitrust Litigation, 2011 U.S. Dist. LEXIS 39001, at * 20-26 (S.D.N.Y. April 8, 2011). Taking the facts of Plaintiffs' Complaint to be true and considering the commercial realities of the relevant industry at issue in this matter, it is plausible that the New York DMA is the relevant geographic market in which Cablevision operates and effectively competes for Two-Way Services with other providers of said services.

Defendant's second argument regarding variations within the New York DMA is also unconvincing insofar as Plaintiffs contend that, even in areas where overbuilders (such as Verizon and AT&T) and satellite providers competed with Cablevision's provision of Two-Way Services during the class period, Cablevision still had an overwhelming market share of, at minimum, 90% of said services in the relevant geographic market. (Third Am. Compl., at ¶ 6, 120). Therefore, accepting Plaintiffs' factual allegations as true, those variations in local or rural markets do not sufficiently impact a determination of shifts in or adjustments to consumer choices within submarkets of the New York DMA. While the Complaint concedes to competitive variations between the conditions of specific geographic markets in which overbuilders and satellite operators have limited incursions in the relevant product market, those variations at the pleading stage are consistent with alleging a plausible geographic market based on a pragmatic, factual approach under Brown Shoe, and do not produce contradictory results as would, for example, the oscillation between the national and tri-state area markets in Mathias.

Finally, the Court finds that Defendant's third argument incorrectly characterizes Plaintiffs' approach to the relevant geographic market definition. Plaintiffs' geographic market definition is not circumscribed after the fact of Plaintiffs' assertion of Defendant Cablevision's dominance; rather, Plaintiffs' definition limits itself to Defendant's areas of operation within the

sole designated market area in which it operates in the United States, an area in which Plaintiffs allege Cablevision also dominates in the relevant product market of Two Way Services.  (Pls. Opp'n Br., at 26).  The Court agrees with Defendant that Plaintiffs may not allege a "very high market share in *a* geographic market," but rather must allege power "in the ***relevant*** geographic market" (Def. Br., at 20), but given that the New York DMA is the only geographic market in which Cablevision operates to offer Two Way Services, the Court does not find that Plaintiffs are boot-strapping their geographic market definition only to areas in which it happens to be dominant.  Therefore, for the above-cited reasons, Plaintiffs have sufficiently alleged facts demonstrating the existence of a relevant geographic market.

> ii.  Relevant Product Markets: Tying Product Market of Two-Way Services, Tied Product Market of Cable Set-Top Boxes, and Coercion.

In antitrust claims reviewed under Rule 12(b)(6), a plaintiff has "the burden of defining the relevant market.  Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)(citations omitted).  However, antitrust claims do not have a heightened pleading standard: "[d]efinition of the relevant product market often requires 'a deeply fact-intensive inquiry,' and courts are hesitant to grant motions to dismiss for failure to plead a relevant market definition."  In re Time Warner, 2011 U.S. Dist. LEXIS 39001, at * 27 (quoting Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001)).  Also, plaintiffs are required to state facts sufficiently alleging coercion: "[t]o prove a per se illegal tie-in, a plaintiff must establish . . . an agreement by a party to sell one product but only on the condition that the

buyer also purchases a different (or tied) product. . . . [I]n the absence of a formal agreement, a

plaintiff must establish in some other way that a tie-in was involved and not merely the sale of

two products by a single seller.  This can be done by proof that purchase of one product, the tied

product, was not voluntary, i.e., by proof of coercion." SmithKline, 575 F.2d at 1062 n. 3.

   Throughout their Amended Complaints, Plaintiffs have with increasing precision defined

the tied product market as the cable set-top box that provides access to Defendant Cablevision's

Two Way Services.  (Compl., at ¶ 29; Am. Compl., at ¶ 39; Sec. Am. Compl., at ¶ 33; Third Am.

Compl., at ¶ 42).   However, Plaintiffs have consistently narrowed their definition of the tying

product market in their respective Amended Complaints from a broad definition of Cablevision's

iO TV Package to only a limited set of interactive services Cablevision provides which are

accessible via a cable set-top box.  Specifically, Plaintiffs' Original Complaint defined the tying

product market as Cablevision's sale of subscriptions to its iO TV Packages.  (Compl., at ¶¶ 22-

23).  This Court found that market definition to be too broad since iO TV Packages allowed

access to certain interactive services through both set-top boxes and CableCARDs.  (Aug. 18,

2010 Op., at 10-11). As a result, the Court held that while Plaintiffs failed to adequately allege

the requisite coercion for a tying claim as defined against those services, actual coercion was

found to be alleged with respect to digital services "not currently available through use of a

CableCARD device: (1) Video On Demand, (2) iO interactive program guide; (3) iO games, and

(4) the ability to order Pay Per View events using a remote control." (Id.).  The Court allowed

Plaintiffs to amend their original complaint, and in their First Amended Complaint, Plaintiffs

redefined the tying product market as "iO TV Package with two way communications so as to

permit Two Way Services."  (Sec. Am. Compl., at ¶ 32).  In its January 14, 2011 Opinion, the

Court found that that Amended Complaint did not "limit the tying product to Two Way

Services," so "the tying product remains an iO TV Package (which is comprised of both one-way and two-way services)." (Jan. 14, 2011 Op., at 5). Since the Court found that Plaintiffs failed to allege a plausible claim for coercion between the whole of the designated tying product and the tied product of the cable box due to only part of the tying product, the Two Way Services, being allegedly tied to the rental of the tied product, the Court again dismissed Plaintiffs' Complaint without prejudice to its refiling. Plaintiffs' Second Amended Complaint defined the tying product as "Two Way Services" to which consumers subscribe through one of Cablevision's iO TV Packages. (Sec. Am. Compl., at ¶ 27). However, the Court found a discrepancy between Plaintiffs' definition of Two Way Services and the contents of an exhibit attached to Plaintiffs' Complaint. That exhibit indicated that "Switched Digital Video Services," which seemed to include the "digital channels and international programming" referenced in Plaintiffs' tying product definition, were potentially accessible through a TiVo/Moxi HD DVR equipped with a CableCARD and Tuning Adapter, and thus did not appear to be exclusively accessible through a cable set-top box. (July 21, 2011 Op., at 6). Since Plaintiffs "attached a document to their Complaint which states that a portion of the tying product (i.e., the 'digital channels and international programming' portion of Two Way Services) can be accessed by Cablevision subscribers without the rental of the tied product (the cable box)," the Court agreed with Defendant that Plaintiffs had again failed to state a claim of coercion that was plausible on its face. (Id.).

In Plaintiffs' Third Amended Complaint, they continue to allege that Defendant has inappropriately tied two distinct products, Two Way Services and set-top cable boxes, to one another. Two Way Services are now defined to include "both the package of interactive services offered by Cablevision . . . and similar packages of interactive services offered by overbuilders

such as AT&T and Verizon," but "Two Way Services offered by other major incumbent cable
companies such as Cox and Time Warner" are not included "because no major incumbent cable
company operates in the geographic areas in which Cablevision operates." (Third Am. Compl.,
at ¶ 3). Critically, the newest iteration of the Complaint excludes the digital channels and
international programming portion of Two Way Services accessible by CableCARD in its "Two
Way Services" definition of the tying product market. (Id., at ¶¶ 37-40). However, Plaintiff
asserts that an ambiguity exists on Defendant Cablevision's website regarding "the full scope of
premium cable services that have not been available to subscribers without a set-top box (i.e.,
with only a CableCARD) at various times during the Class Period." (Id., at ¶ 40 & 40 n. 2). The
Third Amended Complaint alleges that Defendant's current website states that "Switched Digital
Video Services" are accessible via CableCARD, but Defendant's website in 2004 did not
mention these services as accessible via CableCARD (simply stating to website visitors at that
time that "[y]ou will need a Digital set-top box – different than the one you may currently have
to receive analog premium channels – to receive the digital channels, order video on demand
services or listen to digital music channels"). (Id.). Plaintiffs assert that discovery will be
necessary to determine exactly which Two Way Services were available to subscribers without a
set-top box during the Class Period. (Id.). Therefore, while the Third Amended Complaint
defines the tying product market as "Two Way Services" which "include the interactive program
guide, interactive games, Pay TV and On Demand," it also defines the tying product market in
the alternative as "the Two Way Services *plus* any additional premium cable services which are
(or were) not available with a CableCARD during the Class Period." (Id., at ¶¶ 38, 40 n. 2).

Defendant argues that Plaintiffs' Third Amended Complaint should be dismissed because
Plaintiffs fail to sufficiently allege a valid tying product market and because it fails to

sufficiently allege coercion. First, Defendant claims that Plaintiffs have failed to sufficiently

allege a valid tying product market since they allege no facts that justify Plaintiffs' exclusion

from the market of obvious substitutes for Cablevision's Two-Way Services. (Def. Br., at 12).

Specifically, Defendant construes Plaintiffs' tying product market as an invalid "cluster market"

that brings together distinct services which, if differentiated, would include reasonable

substitutes arbitrarily excised by Plaintiffs from the relevant product market. (Id., at 12-16).  For

example, Defendant alleges that the Video on Demand service ("On Demand") included in

Plaintiffs' Two Way Services market faces competition from direct-broadcast satellite ("DBS")

providers, which make digital video recorded movies and programs available for home rental or

sale; internet providers that provide on-demand digital videos; and movie channels such as HBO

or other programming for movies provided through one-way services.  (Id., at 13-14).  Defendant

also contends that the iO Games service provided through its Two Way Services have reasonable

substitutes through other gaming systems, such as Xbox, and that Pay TV has the reasonable

substitutes of ordinary TV or televised events that can be ordered through a CableCARD over

the phone.  (Id., at 14).

       Second, Defendant argues that Plaintiffs' definition of their tying product is identical to

their definition articulated in their Second Amended Complaint which was dismissed by this

Court, and for that reason Plaintiffs again fail to allege the requisite coercion for a tying claim

since some of Cablevision's Two Way Services, namely Pay TV, are accessible to subscribers of

Cablevision's iO TV Packages via CableCARD.  (Id., at 27-28).  Defendant does not state

whether Pay TV was accessible to subscribers of Cablevision's Two Way Services throughout

the relevant class period alongside Pay TV's accessibility via a cable set-top box.

The Court will first address the validity of Plaintiffs' relevant tying product market as it complies with the rule of reasonable interchangeability and cross-elasticity of demand, considering next whether Plaintiffs sufficiently addressed the pleading deficiencies in the Second Amended Complaint regarding coercion.

### a. Validity of Plaintiffs' Tying Product Market

As stated infra, Defendant contends that Plaintiffs' tying product market of Two Way Services must fail as a matter of law because it excludes reasonable substitutes and their "cluster market" concept neither alleges sufficient market power over each clustered service nor is sufficient on the grounds of the existence of "one-stop shopping." (Def. Br., at 12-15). Plaintiffs assert that Two Way Services is a valid tying product market at this stage for three reasons: 1) the "clustered product" is a legally valid market definition under antitrust law and Supreme Court precedent; 2) Defendant failed to state reasonably interchangeable substitutes for the individual services packaged with Cablevision's broader interactive services; and 3) hotly contested factual issues regarding market definition are not appropriately addressed at the motion to dismiss stage. (Pls. Opp'n Br., at 15-23). For the reasons set forth below, the Court finds Plaintiffs' tying product market valid at this juncture.

The Supreme Court has generally considered "cluster" markets in contexts in which, as a matter of trade or commercial reality, a cluster of products create a distinct line of commerce. For example, in a line of cases beginning in 1963, the Supreme Court considered whether clusters of products and services provided by financial institutions could constitute a cluster market of commercial banking with economic significance beyond the various products and services involved, and the Supreme Court found that commercial banking could in fact constitute such a market. See, e.g. U.S. v. Philadelphia Natl. Bank, 374 U.S. 321 (1963); U.S. v.

Phillipsburg Nat'l Bank and Trust Co., 399 U.S. 350, 379-83 (1970); U.S. v. Connecticut Nat'l

Bank, 418 U.S. 656, 660-66 (1974).

In U.S. v. Grinnell Corp., the Supreme Court found a valid "cluster" market of central

station property protective services (central fire alarm and burglary systems) which were not

interchangeable or economic substitutes for an end user, affirming that the Court "see[s] no

barrier in combining in a single market a number of different products or services where that

combination reflects commercial realities." 384 U.S. 563, 572 (1966). In that case, Justice

Douglas suggested that distinct, non-interchangeable services could be grouped together into one

market if "companies recognize that to compete effectively, they must offer all or nearly all types

of service." Id. Grinnell has been interpreted as a valid example in which nonsubstitutable

goods could constitute a relevant "cluster" market based on the rationale of "economies of joint

provision," or economies produced in a relevant market that would give a monopolist of the

combination of separate goods a decisive cost advantage over those who offered the services

separately:

> Under the technology of the day, central station services connected covered homes by a
> wire to a central station, and sensors for motion, window breakage, smoke, fire, and so on
> were connected together. This was almost certainly cheaper than it would be for different
> firms to duplicate the network, each of them offering a single type of protection. The
> relevant questions would then be whether the offeror of the combined services could
> profit by charging a price significantly above its costs, while preventing other firms from
> offering a similar set of combined services. If the answer to both questions is yes, then
> the grouping is a relevant market.

2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 565c, at 409 (3d Ed. 2007). The

"cluster" market has also been taken to stand for the proposition that "courts should cluster a

group of goods when competition causes that group to be supplied together." Ian Ayres,

"Rationalizing Antitrust Cluster Markets," 95 Yale L. J. 109, 112 (1985). More specifically,

antitrust scholars have suggested that courts should cluster goods which are "transactional

complements," or goods that, if bought from a single firm, significantly reduce consumers' transaction costs, tying consumer purchases of those products to individual firms. Id., at 110-11. In sum, "cluster" markets should arguably be found invalid unless: 1) most customers would be willing to pay monopoly prices for the convenience of receiving a defendant's grouping of products; or 2) economies of joint provision make distribution of the cluster cheaper per good than distribution of each separately, and firms supplying one of the products in the cluster could not easily add the others as well. Areeda & Hovenkamp, at 408. "If aggregation reveals 'an important relationship between the defendants' course of conduct and their overall monopoly power,' it is indeed a useful and, hence, appropriate methodology. If, however, aggregation obscures, rather than reveals, it cannot be justified." United States v. AT&T, 524 F. Supp. 1336, 1376 n. 165 (D.D.C. 1981)(finding a cluster market on the grounds of "industry recognition, coincidence of supplying firms, and the integrated nature of the telecommunications system").

The Third Circuit Court of Appeals has affirmed a district court's determination that a cable company's "clustering" activity may establish a relevant market in the context of swaps and acquisitions made in a given geographic market where consumers face similar competitive choices since that determination considered both where a buyer may rationally look for goods and the commercial reality of the industry. Behrend, 655 F.3d at 194. While the Third Circuit reviewed clustering in the context of a geographic market, the Court finds that an analysis of a valid market from the perspective of consumer behavior, reviewing the competitive choices of end users based on the commercial reality of the industry, is equally applicable here where Plaintiffs' Complaint alleges geographic consolidation of Defendant Cablevision's Two Way Services market alongside the provision of a collection of nonsubstitutable services.

The facts alleged by Plaintiffs in support of finding a valid "cluster" market of Two Way Services are the following. Cablevision itself defined its Two Way Services as a package on its website: "iO TV interactive services are not available with a CableCARD. In order to receive interactive digital services such as iO Video on Demand, and the iO interactive program guide and to order pay per view events using your remote, you must have a digital cable box." (Third Am. Compl., at ¶¶ 8, 41, 98). Further, Plaintiffs' Complaint provides facts detailing the unique nature of Cablevision's product as a "bundled" product: its provision of a "multitude of services" to consumers "with the ability to select from and view a variety of programming"; allowing subscribers to "have control over these viewing options simply by using their television remote controls without having to even leave their couch"; and

> Allow[ing] consumers to navigate through a vast array of programming options and choose the options that suit them best in a given moment. Subscribers can choose from a live sporting event in high definition, a brand new television show, or specialized coverage of a breaking current event. Video rentals, whether from a brick and mortar store, a mail service, on an internet site, do not offer consumers any of those options. Moreover, consumers cannot access video rentals from brick and mortar stores or Netflix on a sudden whim, as they can with Two Way Services. In addition, brick and mortar rental stores like Blockbuster have been reducing staff, reducing hours and closing in recent years while the number of Two Way Services subscribers and the prices of subscriptions have increased consistently. These products are functionally and substantively different from Two Way Services and are not reasonably interchangeable with Two Way Services. Websites or internet vendors did not offer a comparable produc[t] to interactive Two Way Services during the Class Period.

(Id., at ¶¶ 114-116). Plaintiffs thus argue, "consumers view the Two Way Services provided by Cablevision as functionally superior, more readily available and easier to use than the individual one way services cited in Defendants' brief." (Pls. Opp'n Br., at 20).

Further, Plaintiffs' Complaint alleges that overbuilders such as AT&T and Verizon cannot compete with said packaged services readily because Cablevision has taken steps to

frustrate their competitive entry. (Third Am. Compl., at ¶ 80). Specifically, Plaintiffs cite to the

FCC's January 20, 2010 Report and Order, which states:

> Cable operators continue to have the incentive and ability to withhold or take other unfair acts with their affiliated programming in order to hinder competition in the video distribution market. A vertically integrated cable operator may raise the costs of its MVPD competitors by increasing the price of its affiliated programming or may choose not to sell its affiliated programming to rival MVPDs. As the Commission noted in the Adelphia Order, "the integrated firm may be able to harm its rivals' competitive positions, enabling it to raise prices and increase its market share in the downstream market, thereby increasing its profits while retaining lower prices for itself or for firms with which it does not compete." Unfair acts involving cable-affiliated programming may harm the ability of MVPDs to compete with incumbent cable operators, thereby resulting in less competition in the marketplace to the detriment of consumers.

(Id., quoting FCC January 20, 2010 Report and Order, at ¶ 26). Barriers to entry to overbuilders

alleged in this case include: "the enormous costs associated with building and maintaining a

broadband network infrastructure; the cost and pricing advantages that incumbent cable

providers like Cablevision have vis-à-vis overbuilders; and the significant time and expense

associated with the franchising application process." (Id., at ¶ 111). Finally, Plaintiffs assert that

"Cablevision has increased the number of its Two Way Services customers, despite increasing its

prices, every year during the class period, despite the onset of supposed competition from

individual services such as Xbox and Netflix, demonstrating that the market did not consider

those individual components to be reasonable substitutes for Cablevision's package of Two Way

Services." (Id., at 21; see also Third Am. Compl., at ¶¶ 59-65).

The Court finds these alleged facts to be sufficient for establishing a "cluster" product

market of Two Way Services in that the combination of interactive services provided is a

combination reflective of the commercial realities in the industry of MVPDs creating a distinct

line of commerce. Specifically, the Plaintiffs' Third Amended Complaint pleads sufficient facts

to establish that differences exist between the Defendant's provision of interactive services and

18

non-cable and other entertainment providers that offer individual services or partial clusters that are not bundled together in a convenient, comprehensive format accessible through a remote from the interior of a home. See e.g., Science Products Co. v. Chevron Chem. Co., 384 F. Supp. 793, 797 (N.D. Ill. 1974)(finding that a "substantial overlap of locus of use for . . . products generally" supports cluster definition); In re The Grand Union Co., 102 F.T.C. 812, 1044 (1983)(stronger case for clustering where services are involved, especially "where the services are complex, interrelated, and interdependent"). Similar to the facts alleged in Grinnell, Plaintiffs state facts regarding the provision of services connecting homes that have subscribed to Cablevision's Two Way Services to a central system through which said homes can access and control a range of entertainment options, the combination of which being difficult to duplicate by overbuilders, satellite providers, or individual firms providing only, for example, games or videos. It is plausible that the economies of joint provision of Two Way Services make distribution of interactive services cheaper per individual service than distribution of each service separately, and firms supplying one of the products in the cluster–for example, Netflix with videos or DBS providers with digital channels–cannot easily add other services such as Video on Demand or gaming services through instant and direct home delivery.

Defendant contends that "goods cannot be clustered unless there is sufficient basis for inferring that the defendant has the required degree of market power over each of the goods in the cluster." (See Def. Br., at 15; Areeda & Hovenkamp, at 408). Defendant cites to U.S. v. Phillipsburg Nat'l Bank & Trust Co. and Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP to support their argument that clustering is a "severe exception" not to be found where either of the following exist on their own: 1) where packages make access possible to services that would otherwise be unavailable; or 2) where a plaintiff can show "[t]he existence of

one-stop shopping, and a group of customers with a preference or even demand for it." (See Def.

Br., at 15-16; Phillipsburg, 399 U.S. at 360; Emigra Group, 612 F. Supp. 2d 330, 352-55

(S.D.N.Y. 2009).  However, based on the facts alleged in Plaintiffs' Third Amended Complaint,

neither of these conditions exist on their own in this case without additional facts alleged.

     First, the facts alleged here are close to those in Phillipsburg in which the Court found

that customers were likely to maintain certain accounts in the same local bank even when higher

savings interest was available elsewhere due to the convenience of one-stop banking and the

advantages of a consistent and continuous relationship with one banker.  399 U.S. at 361.

Likewise, here, it is plausible to infer that the separate services provided by Cablevision made

possible access to services that may otherwise have been unavailable from a home through a

remote control.  Thus, unlike the facts in Queen City Pizza where the relevant market was found

not to be Domino's-approved tomatoes or dough for franchisees, but rather the entire available

markets for tomatoes and pizza dough, the interactive services at issue here are not

interchangeable with submarket products purchasable in each wider submarket.  Interactive Two-

Way Services are a qualitatively different, unique product, more analogous to a set of facts in

which Domino's were the only seller in a geographic market of green tomatoes and then required

franchisees to only use green tomatoes in their franchise pizza production.  More specifically in

the context of tying jurisprudence, the separate relevant submarkets neither constitute reasonable

substitutes for the package nor do the separate submarkets broken down into their separate

elements–digital channels / one-way services, cable TV, on-demand video, interactive gaming–

provide reasonable substitutes for those services as provided through Cablevision's Two Way

Services.

For example, Defendant argues that satellite providers and one-way movie channels through normal or cable TV should be viewed as a reasonable substitute for the digital channels provided through Cablevision's Two Way Services. (Def. Br., at 13-14).  However, neither satellite providers nor one-way services through movie channels like HBO offer interactive services in which a customer can select specific viewing events at the time of their choosing in their home through a remote control.  One-way services as provided by satellite providers are equally distinguishable from the viewing services offered through an interactive communication system like Cablevision's Two Way Services.  In Parsons v. Bright House Networks, the Northern District of Alabama found that plaintiffs' exclusion of satellite MVPDs from their definition of the relevant tying product market could survive a motion to dismiss since plaintiffs alleged sufficient facts that satellite providers did not constitute reasonable substitutes for premium cable services due to: 1) defendants' own representations that they provide superior services and reliability over satellite providers; 2) satellites may only be installed on an external surface with clear sky access, which may be unavailable in urban areas or banned by multi-family dwellings such as apartments; 3) cable MVPDs' ability to "bundle" cable services with phone and internet services where satellite providers could not created high entry barriers in the form of: costs for constructing a parallel cable system, obtaining licenses from local franchises authorities, accessing multi-family dwellings such as apartments and obtaining programming rights to popular channels; and 4) high switching costs from incumbent MVPDs to different providers in terms of time and money in set-up and new equipment.  2010 U.S. Dist. LEXIS, at * 7-9, 19-20.  In this case, Plaintiffs cite to Cablevision's explicit statement that, "We compete with . . . DBS [satellite] competitors by 'bundling' our service offerings with products that DBS companies cannot efficiently provide at this time, such as high-speed data service and voice

service carried over the cable distribution plant, as well as by providing interactive services that are currently unavailable to a DBS subscriber." (Def. Mot. to Dismiss, Halpern Decl., Ex. 5, "Cablevision 2009 Form 10-K, filed February 25, 2010," at 48; Third Am. Compl., at ¶ 69). Further, Plaintiffs' Third Amended Complaint alleges facts pertaining to Cablevision's programmer-distributor contracts which were executed before satellite providers existed which gives Defendant more popular programming options than satellite providers and establishes barriers to their entry. (Third Am. Compl., ¶ 70). Finally, Plaintiffs allege that satellite and cable MVPDs are technologically distinct in that satellite technology uses a telephone line as an exchange, and the receiving unit does not have the ability to transfer information back to the satellite for use in interactive services. (Id., ¶ 71). Therefore, the Court finds that neither one-way movie channels nor satellite providers not constitute reasonable substitutes for the provision of digital channel or video programming through Two Way Services, and Plaintiffs have alleged sufficient facts distinguishing their interchangeability.

Further, Plaintiffs have alleged sufficient facts to infer that other submarkets which Defendant introduces as reasonable substitutes for individual services provided through its Two Way Services do not in fact constitute reasonable substitutes. Specifically, Plaintiffs have alleged sufficient facts to survive a motion to dismiss with respect to the reasonable comparability of entertainment services such as internet streaming, Netflix and gaming systems like Xbox and Playstation. Plaintiffs assert that these internet services are not interchangeable with the package of Two Way Services in that website and internet vendors: 1) do not offer a comparable selection of offerings as the cable MVPD companies in part due to content providers' concern about distributing copyright material; 2) have poorer quality of internet videos with longer download times and higher rates of interruptions in viewing; and 3) were

nascent ventures during the Class Period and had an extremely limited customer base. (Id., ¶ 116). Gaming services is alleged not to provide comparable service as iO Games in that the interactive service provided through Cablevision allows subscribers to instantly choose, through a remote control in their home, a specific game amongst a vast array of options which would be best suited to their wishes in the moment. (Id., ¶ 115). Thus, the facts alleged by Plaintiffs plausibly state why subscribers may not find each individual submarket service interchangeable with those provided through Cablevision's Two Way Services. The many distinguishing features alleged by Plaintiffs within each submarket of goods are sufficient to plead a valid relevant product market of Two Way Services worthy of surviving a motion to dismiss.

Second, while Plaintiffs in part allege a one-stop shopping theory here as articulated infra, they also state facts alleging more than just consumer convenience. Defendants reject Plaintiffs' cluster product definition in part on the grounds that it is based on a one-stop shopping theory, and they cite to Areeda and Hovenkamp in their assertion that "courts typically and properly reject claims that customers find 'one-stop' shopping for noncompeting goods attractive, notwithstanding lower prices elsewhere. . . . the courts properly focused on the facility providing the nonsubstitute goods, but they refused to find a relevant market because there was no evidence that the combination could not readily be duplicated by other sellers in response to supracompetitive prices." Areeda & Hovenkamp, at 410. However, in this case, Plaintiffs allege more than the benefits of a one-stop shopping service provided by Cablevision since they also allege facts about pricing and facts about the ability of other sellers to compete with the same bundle of services:

- "[E]ven after significantly increasing the price Cablevision charges for subscriptions to premium cable packages that include Two Way Services, Cablevision has not only retained a substantial number of such subscribers, but has regularly increased the number of subscribers to Two Way Services" (Third Am. Compl., ¶ 59);

- "Cablevision does not face any appreciable competition from major cable operators, as each of these major cable companies employ the same 'clustering' strategy, in which they concentrate their cable operations in geographic areas where only one incumbent has the infrastructure to operate" (Id., ¶ 106);

- "[T]he clustering and bundling strategies . . . as well as the long term contracts which enable cable operators to offer more popular programming options, were (and are) effective in enabling Cablevision – like other cable providers – to achieve and maintain market dominance in the areas in which it operates" (Id., ¶ 110);

- "Video game systems (such as X-box) and video rental services (such as Netflix and Blockbuster) are not reasonable substitutes for Two Way Services, which provide a combination of valuable services in a convenient comprehensive format." (Id., ¶ 115).

Based on facts alleged concerning interchangeability of the services product, consumer preference, pricing, and other sellers' ability to duplicate, Plaintiffs have sufficiently stated a relevant tying product market of Two Way Services beyond a mere cluster market definition resting in a one-stop shopping theory. Therefore, the Court finds at this stage that Plaintiffs have sufficiently alleged a valid tying product market. Defendant does not contest the validity of the tied product market in their Motion to Dismiss Plaintiffs' Third Amended Complaint.

### b. Coercion Through Involuntary Purchase of Tied Product

Defendant contends that Plaintiffs have again failed to sufficiently allege coercion for two reasons: 1) Plaintiffs solely challenge technological incompatibility, so their Third Amended Complaint fails to allege coercion as a matter of law under Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 542 (9th Cir. 1983); and 2) Plaintiffs include in the purported tying product a service that can be accessed by Cablevision subscribers without the rental of the tied product, the set-top cable box. (Def. Br., at 25-29). Plaintiffs assert on the contrary that: 1) Plaintiffs Third Amended Complaint contains no allegations of technological incompatibility as a basis for their coercion claim and thus Defendants' argument goes beyond the pleadings; 2) to the extent that Plaintiffs' Complaint preserves allegations made in the Original Complaint

regarding technological incompatibility, no binding legal authority prevents such an allegation as a basis for establishing coercion; 3) Plaintiffs removed "Switched Digital Video Services" from the primary market definition of the tying product market, a service which could be accessed without the rental of the cable box; and 4) the "Pay TV" services included in Plaintiffs' tying product market definition are limited to those accessible by remote control and exclude any services which allow Cablevision customers to purchase pay-per-view events by phone.  (Pls. Opp'n Br., at 5-10).

This Court agrees with Plaintiff that the Third Amended Complaint sufficiently alleges coercion.  Since the facts of this case are distinguishable from <u>Foremost</u>, the Court does not find any preserved claims regarding technological incompatibility to be deficient as a matter of law to allege coercion.  To the extent that Plaintiff's Third Amended Complaint has excluded those services sold by Defendant Cablevision not conditioned on the lease of a cable box, Plaintiff's Complaint has sufficiently narrowed the tying product market at this stage of the pleadings. Therefore, Plaintiffs' complaint complies with the requirement cited by this Court from <u>In re Time Warner</u>, which stated that "[o]nly those services which were unavailable to consumers who opted to use the alternative CableCARD to access secured channels, despite paying an additional fee for the service, caused consumers to be actually coerced into renting a cable box." <u>In re Time Warner Inc. Set-Top Cable TV Box Antitrust Litigation</u>, 2010 U.S. Dist. LEXIS 22369, at * 26 (S.D.N.Y. Mar. 5, 2010).

As stated above, a significant element of an illegal tying arrangement is coercion of the consumer by the seller in the form of conditioning the sale of the tying product on the consumer's purchase of the tied product.  See <u>Northern Pac. Ry. Co. v. United States</u>, 356 U.S. 1, 5-6, 10 (1958); <u>Times-Picayune Publishing Co. v. United States</u>, 345 U.S. 594, 605 (1953).

"[W]here the buyer is free to take either product by itself, there is no tying problem. . . ."

Northern Pac. Ry. Co, 356 U.S. at 6 n. 4.  The Supreme Court has focused on the danger of tying when a seller leverages economic power from one market to another: "Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits for the tied item is restrained and the Sherman Act is violated."  Jefferson Parish, 466 U.S. at 12.

### 1) Technological Incompatibility

While Defendant contends that Plaintiffs' coercion challenge solely relies on technological incompatibility, a claim insufficient to establish an unlawful per se tying arrangement, the Court finds that any preserved claims regarding technological incompatibility alleged in Plaintiffs' Complaint are not deficient as a matter of law to allege the requisite element of coercion in this case.

In Foremost, plaintiff Foremost Pro Color, an authorized Kodak dealer and independent photofinisher brought, inter alia, a tying claim against Eastman Kodak Company alleging that, because Kodak's newly issued 110 cameras could only use new Kodacolor II film, and because this film could only be processed with Kodak's own new papers and chemicals, Kodak had unlawfully tied: the sale of cameras to film, film to chemicals, and chemicals to paper and film in violation of § 1 of the Sherman Act and § 3 of the Clayton Act.  Foremost, 703 F.2d at 537.  In upholding the district court's granting of defendant Kodak's Rule 12(b)(6) motion to dismiss for failure to state a tying claim, the Ninth Circuit held that the requisite element of coercion was absent from plaintiff's claim.  Specifically, the court found that plaintiff had not sufficiently

26

alleged "that the purchase of the alleged tied products was required as a condition of sale of the alleged tying products, rather than a prerequisite to practical and effective use of the tying products." Id., at 542. Elaborating on coercion in the context of "technological ties," the court found procompetitive aspects in said ties which protect product innovation "in such technologically advancing industries as the photographic industry. . . . The creation of technological incompatibilities . . . increases competition by providing consumers with a choice among differing technologies, advanced and standard, and by providing competing manufacturers the incentive to enter the new product market by developing similar products of advanced technology." Id. If a court were to find the development of new cameras which require new processing materials a per se unlawful tie, such technological innovations and procompetitive benefits would be thwarted since "[t]he essence of a .per se unlawful tying arrangement . . . is that it forecloses competition in the market for the tied product or products." Id. Therefore, the court held that, "as a general rule . . . the development and introduction of a system of technologically interrelated products is not sufficient alone to establish a per se unlawful tying arrangement even if the new products are incompatible with the products then offered by the competition and effective use of any one of the new products necessitates purchase of some or all of the others. Any other conclusion would unjustifiably deter the development and introduction of those new technologies so essential to the continued progress of our economy." Id., at 542-43.

Taking the facts alleged in Plaintiffs' Complaint to be true, this case is distinguishable from Foremost in at least two respects: 1) Defendant has not presented evidence that it is in the business of developing and introducing a "system of technologically interrelated products" similar to the camera, film, paper and chemicals system developed and introduced by Kodak; and

2) Plaintiffs did not claim that it was the technological tie, standing alone, which constituted the coercive element in the allegedly unlawful tying arrangement, but rather that third-party boxes were compatible with Defendant's Two Way Service and rental of set-top boxes from Defendant was nevertheless required despite that compatibility.

Regarding the first issue, Cablevision has presented no evidence of its development and introduction of a technologically innovative tying or tied product. Other cable MVPDs such as Comcast, Time Warner, and Cox offer Two Way Services virtually identical to the service provided by Defendant, and Defendant presented no distinguishing aspects to its service that indicate technological innovation in its provision. Further, the set-top boxes Defendant rents to consumers to whom it provides Two Way Services were not developed by them at all, but were rather developed by third parties such as Scientific Atlanta and Motorola who have contractual relationships with Defendant and other cable MVPDs in other geographic markets. In fact, Defendant Cablevision was not even in a position during the purported Class Period to make innovations in the cable set-top box market as it was not engaged in the manufacture and production of such boxes; it was not "a firm that pioneers new technology" that "introduce[d] the first of a new product type along with related, ancillary products that can only be utilized effectively with the newly developed technology" as in <u>Foremost</u>. <u>Id.</u>, at 542. Therefore, neither the aspects of the technological tie found to be insufficient in <u>Foremost</u> nor the procompetitive benefits articulated there are applicable to the facts alleged in this case.

Second, Plaintiffs do not limit their allegations regarding coercion to a technological tie. The facts stated in Plaintiffs Third Amended Complaint are that "Cablevision . . . engaged in coercive anti-competitive practices by restricting the sources or outlets through which a usable cable set-top box can be acquired by Class members. Namely, Cablevision requires that Class

members rent cable set-top boxes exclusively from Cablevision to access Two Way Services."

(Third Am. Compl., at ¶ 44). Specifically, Plaintiffs allege,

> Cablevision has prevented and continues to prevent all other non-Cablevision rented set-top boxes from being viable alternatives to, and substitutable for, the set-top boxes distributed by Cablevision, **even though the set-top boxes distributed by Cablevision use the same technology as other set-top boxes available from other sources**. In fact, the set-top boxes that Cablevision requires class members to rent exclusively from Cablevision are of the same make and model as those manufactured by, inter alia, Cisco Corporation's Scientific Atlanta subsidiary, which models are also used by other major cable companies including Time-Warner, Comcast and Cox. Yet, because of Cablevision's conduct, these boxes are not usable by Class members if they are obtained from sources other than Cablevision.

(Id., at ¶ 48)(emphasis added). Plaintiffs thus assert additional facts beyond a technological tie regarding Defendant's coercion of the consumer by conditioning rental of the tied product with the purchase of the tying product. The facts alleged here in the world of Foremost would be more analogous to a situation in which other companies besides Kodak produced paper and chemicals capable of processing film from Kodak's new camera, but Kodak was nevertheless conditioning sale of the new camera on the concomitant purchase of paper and chemicals exclusively from Kodak.

To conclude, since Foremost is not governing law in this Circuit, and since, in any case, the facts alleged in Plaintiffs' Third Amended Complaint distinguish this case from those facts alleged in Foremost, the Court finds that, even if a component of Plaintiffs' claims regarding coercion incorporate an argument regarding technological incompatibility, Plaintiffs have pled sufficient facts to allege coercion.

## 2) Third Amended Complaint's Narrowing of the Tying Product Market

Defendant also argues that, because Plaintiffs include in their purported tying product a service that can be accessed by Cablevision subscribers without the rental of the set-top cable box, Plaintiffs have again failed to allege coercion. However, the Court finds that Plaintiffs

removal of "Switched Digital Video Services" and limiting of "Pay TV" services to those accessible by remote control sufficiently narrows the tying product market to assert coercion over consumers in the tied product market.

In this Court's prior Opinions, insufficient coercion was found where portions of the tying product could be accessed by Cablevision subscribers without the rental if the tied product. (Aug. 18, 2010 Op., at 9; Jan. 14, 2011 Op., at 5; July 21, 2011 Op., at 6). In Plaintiffs' Third Amended Complaint, Plaintiffs excise "'Switched Digital Video Services' from the primary definition of the tying product market, and limits this market to those services that Defendants, themselves, acknowledge require rental of a Cablevision set-top box." (Pls. Opp'n Br., at 5). The Third Amended Complaint defines the tying product market as those Two Way Services which Cablevision's website explicitly stated were not available with a CableCARD: "Video on Demand, iO interactive program guide, iO Games, and the ability to order Pay Per View events using your remote. . . . A digital cable box is required to receive these features." (Third Am. Compl., at ¶¶ 41-42, 98). In a similar case before the Western District of Oklahoma, the court found that the plaintiffs in the multidistrict litigation alleging tying violations against Cox Enterprises and Cox Communications survived a motion to dismiss where it was

> clear from the allegations in the [complaint] that customers wishing to receive the full benefit of their premium cable subscription ha[d] no choice but to rent a set-top box from Cox. Indeed, as the [complaint] demonstrates, Cox's own advertising and consumer communications establishes this relationship. Moreover, the [complaint] alleges Defendants have engaged in conduct which minimizes the viability of the use of cable cards to receive the full panoply of premium cable services. Thus, the Court finds that Plaintiffs have alleged facts sufficient to demonstrate Cox has engaged in coercion, thereby satisfying the second element of a prima facie case.

In re Cox, 2010 U.S. Dist. LEXIS 58417, at * 17-18. Plaintiffs here also rely on advertising and consumer communications made to customers of Cablevision's Two Way Services regarding what services were and were not accessible through a cable set-top box, and Plaintiffs also

clearly allege conduct which minimizes CableCARD access to Cablevision's full panoply of Two Way Services. The Complaint carves out "Pay TV" Pay-Per-View events ordered by phone, narrowing the tying product market only to those Pay-Per-View events accessible through remote control since "a customer's ability to access Pay Per View by using a remote control is what makes it a "two way" digital service." (Pls. Opp'n Br., at 6). Therefore, to the extent that Plaintiffs have limited their tying product market to interactive Two Way Services accessible only by remote control through a cable set-top box, Plaintiffs have sufficiently alleged the requisite element of coercion to survive Defendant's Motion to Dismiss.

  iii. Market Power in the Tying Product Market Restraining Competition in the Tied Product Market

  The Supreme Court has required that, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Illinois Tool Works, Inc. v. Independent Ink, Inc., 547 U.S. 28, 46 (2006); Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 200-201 (3d Cir. 1994)("The first inquiry into any § 1 tying case is whether the defendant has sufficient market power over the tying product . . . . If the defendant is found to have sufficient market power in the tying product market, then the tie may be a 'per se' violation of the Sherman Act"). Market power "is the power to 'to force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak, 504 U.S. at 464 (quoting Jefferson Parish, 466 U.S. at 14).   The focus of the Court should be "whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." Fortner Enters., Inc. v. United States Steel Corp., 394 U.S. 495 (1969).

  In their Third Amended Complaint, Plaintiffs allege the following:

- "Cablevision's substantial monopoly power, market power and/or economic power in the tying product market is evidenced by, <u>inter alia</u>, the fact that approximately 2.9 million of Cablevision's 3.0 million customers subscribe to Two Way Services through an iO Package. This represents nearly 97% of Cablevision's customers" (Third Am. Compl., at ¶ 54);

- "Cablevision's dominant market share numbers for the overall cable market . . . together with the additional facts set forth below, demonstrate that Cablevision also possesses a dominant share in the market for Two Way Services. Specifically:

  - Cablevision possessed a 90% or greater share of the overall cable market in the area in which it operates within the New York DMA throughout the Class Period. Indeed, since Cablevision has repeatedly indicated that it has the highest penetration in the nation, its market share in the Two Way Services market likely exceeds that of the New York DMA, as a whole;

  - . . . [O]ver 97% of Cablevision's cable customers subscribe to Two Way Services as part of a premium cable package. Therefore, Cablevision's share of the overall cable market is also highly indicative of its share of the market for Two Way Services;

  - . . . [O]ver 99% of [Cablevision's premium cable] subscribers rent set-top boxes from Cablevision . . . ;

  - Only two competitors of Cablevision – AT&T and Verizon – operate in the geographic areas where Cablevision operates, and provide comparable packages of Two Way Services. . . . AT&T and Verizon have had no more than a combined 10% of the overall cable market in the New York DMA throughout the Class Period. . . . Cablevision necessarily possessed a dominant share of the market for Two Way Services in the areas in which it operated . . . throughout the Class Period – over 80% at a minimum. This share easily exceeds the 30% market share needed to establish market/monopoly power in this Circuit" (<u>Id.</u>, at ¶ 55);

- "Cablevision's monopoly, market and/or economic power in the tying product market are further evidenced by the fact that, even after significantly increasing the price Cablevision charges for subscriptions to premium cable packages that include Two Way Services, Cablevision has not only retained a substantial number of such subscribers, but has regularly increased the number of subscribers with Two Way Services. This is direct evidence of Cablevision's substantial economic power, monopoly power and/or market power" (<u>Id.</u>, at ¶ 59);

- "Cablevision instituted the following annual increases in its rates during the Class Period: 2010 + 3.7%, 2009 + 3.5%, 2008 + 4.7%, 2007 + 1.1%, 2006 + 2.3%, and 2004 + 3.2%. These rate increases include increases in the rates charged by Cablevision for the premium cable packages which provide Two Way Services. (As

alleged above, premium cable packages which include Two Way Services constitute the vast majority of cable packages sold by Cablevision)" (Id., at ¶ 60);

- "Despite these significant annual price increases, Cablevision has been able to add subscribers with Two Way Services.  For instance, from December 2006 through the end of the Fourth Quarter of 2007, the total number of subscribers with Two Way Services increased by approximately 181,000, or 7.4%.  From December 2007 to the end of the Fourth Quarter of 2008, the total number of subscribers with Two Way Services increased by approximately 208,000, or 7.9%.  Further, from December 2008 to the end of the Fourth Quarter of 2009, the total number of subscribers with Two Way Services increased by 56,000, or 2.0%" (Id.).

Defendant Cablevision claims that Plaintiffs have not cured the pleading deficiencies addressed in this Court's July 21, 2011 Opinion regarding Defendant's market power in the tying product market.  In particular, Defendant argues: (1) Plaintiffs fail to provide "direct proof" that Defendant has been able to retain customers despite an increased price in Two Way Services; or, in the alternative, (2) Plaintiffs have failed to allege high market share in Two Way Services coupled with barriers to entry, or "structural evidence" of market power.  In our July 21, 2011 Opinion, this Court found that Plaintiffs' Second Amended Complaint, "in attempting to allege market power, . . . conflates Cablevision's provision of Two Way Services with its provision of all cable programming."  (July 21, 2011 Op., at 7).  Further, the Court found that "Plaintiffs have alleged no specific facts to support the theory that dominance in a market that includes multiple products – both one way and Two Way Services – equates to dominance in the Two Way Services market. . . . Nor have Plaintiffs alleged any specific facts which would allow the Court to otherwise infer that Two Way Services – as opposed to one way services – drive the most demand within the relevant packages."  (Id., at 8).  The concern expressed in that Opinion was that the Two Way Services market was exclusively defined in relation to and as a subset of premium cable services as provided by Defendant Cablevision, which is an improper mechanism for determining market power because "[i]t would be as if a plaintiff had adequately alleged a

product market consisting of orange juice, but relied on the defendant's position in the overall beverage industry as evidence of market power." In re Set-Top Cable Television Box Antitrust Litig., 2011 U.S. Dist. LEXIS 39001, at * 39.

The Court disagrees that Plaintiffs have not sufficiently alleged facts regarding Defendant's market power in the tying market of Two Way Services in their Third Amended Complaint. The Court has already found infra that Plaintiffs have sufficiently alleged valid tying and tied product markets. Plaintiffs thus must only show that Cablevision had sufficient market power in the relevant geographic market in which it operates to coerce customers for Two Way Services into renting set-top boxes as a condition of receiving said Two Way Services.

Plaintiffs' Third Amended Complaint alleges facts purporting to show "direct proof" of market power through alleging that Cablevision had a minimum of an 89% market share in the Two Way Services market. The Complaint alleges that, out of all cable service available to consumers in the New York DMA, Cablevision penetrates 90% of the cable market (compared to about 10% market share for overbuilders AT&T and Verizon). (Third Am. Compl., at ¶¶ 7, 52-58). Plaintiffs allege that, since 97% of Defendant's premium cable customers have purchased Two Way Services, and that the only other cable providers that provide such services are their competitors AT&T and Verizon (satellite providers not being technologically capable of providing said services), Cablevision has a minimum of 89% market share of the Two Way Services market. (Id.; Pls. Opp'n Br., at 11). Further, the Third Amended Complaint alleges that, despite Cablevision's continued and significant increase in its prices over a six-year period, it did not only not lose sales during that period but substantially increased revenues, a key indication of market power. (Third Am. Compl., at ¶¶ 58-65; see Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 307 (3d Cir. 2007)("[i]f a firm can profitably raise prices without

causing competing firms to expand output and drive down prices, that firm has monopoly power")).

The Third Amended Complaint also alleges facts supporting indirect, or structural, proof of market power by alleging Cablevision's high market share in Two Way Services coupled with barriers to entry. As stated above, the Complaint states facts regarding Cablevision's market power in Two Way Services by simultaneously narrowing the tying product market and alleging a 89% share for Cablevision's provision of Two Way Services in that product market. Plaintiffs additionally cite to barriers of entry: Cablevision's "clustering" activities to consolidate its control of the geographic market; "bundling" its products by providing customers with broadband internet access and phone services over the same cable infrastructure that it uses to provide video cable service; offering superior programming through long-standing programmer-distributor contracts; and utilizing technological, structural, cost and pricing advantages to prevent overbuilders from threatening its dominance in the tying product market. (Third Am. Compl., at ¶¶ 66-80).

Although Plaintiffs may still be presented with difficulties and challenges proving that Cablevision has market power, the allegations in the Complaint are sufficient to make such a finding plausible at this stage in the proceedings. Plaintiffs have detailed facts suggesting both direct and indirect proof which, if taken to be true, indicate that Cablevision controls a large portion of the narrowly defined Two Way Services market in the New York DMA, and can therefore manipulate pricing without regard to competition in that area. Accordingly, the Court concludes that Plaintiffs have properly pled that Cablevision possesses the requisite market power to make out a tying claim.

iv. Effect on Interstate Commerce

35

Plaintiffs contend that Cablevision's actions have an effect on interstate commerce as required for a per se tying claim in that Cablevision operates in New York, New Jersey and Connecticut (the New York DMA).  (Third Am. Compl., at ¶¶ 23, 52); see, e.g. Northern Pacific, 356 U.S. at 5; Town Sound & Custom Tops, 959 F.2d at 477.  Specifically, the Complaint states that "Defendants' conduct substantially affects interstate commerce by foreclosing and eliminating competition in the market for the tied product in the areas where Cablevision operates.  This lack of competition in this market has caused substantial anticompetitive effects, including higher prices for the tied product, lesser choice and dampened incentives to innovate. (Third Am. Compl., at ¶ 154).  Defendant Cablevision does not contest Plaintiffs' allegations regarding its effect on interstate commerce in its submissions in support of its Motion to Dismiss. Thus, the Court, taking the facts alleged in Plaintiffs' Complaint to be true, finds it plausible that Cablevision's alleged conduct meets this third and final requirement for a per se tying claim.

**2) Plaintiffs' § 1 Tying Claim – Rule of Reason Analysis**

To sufficiently assert a tying claim under a rule of reason theory of liability, plaintiffs need not prove that the seller has power in the tying product market, but must set forth: 1) a viable theory of causation of antitrust injury in that a defendant's alleged tying resulted in anticompetitive effects (e.g., through the forced purchase of inferior goods, consumer surprise, difficulty in consumer ability to make proper price comparisons, or foreclosure of the tied product market); and 2) a rebuttal at trial of defendant's procompetitive justifications, if any. Town Sound, 959 F.2d at 482-94.  Rule of reason claims are still available to plaintiffs who do not succeed in their per se tying claims.  Id.; see, e.g., Jefferson Parish, 466 U.S. at 17-17; Fortner, 394 U.S. at 499-500; Times-Picayune, 345 U.S. at 614-15; Town Sound, 959 F.2d at 482.  Since this Court finds that Plaintiffs have sufficiently pled facts regarding a per se tying

violation, the requisite elements generally required for proving a tying violation under a rule of reason analysis—causation of antitrust injury and rebutting procompetitive justifications for a tie-in—need not be assessed at this stage. See Town Sound, 959 F.2d at 477. However, the Court cautions that survival of a motion to dismiss is no guarantee of the ultimate success on the merits of any per se tying claim, and an assessment based upon a rule of reason theory of liability may be required at future stages of the proceedings in this matter based on the sufficiency of the evidence presented on the record.

### 3) Plaintiffs' § 2 Monopolization Claim

Section 2 of the Sherman Act sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations." 15 U.S.C. § 2. Monopolization under Section 2 consists in: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 570-71; see also Harrison Aire, Inc. v. Aerostar International, Inc., 423 F.3d 374, 380 (3d Cir. 2005). Plaintiffs have the burden of defining the relevant § 2 product market. See Queen City Pizza, 124 F.3d at 436. To have standing to seek a § 2 claim, Plaintiffs must show that they have suffered an "antitrust injury" as a result of Defendant's misconduct so as to possess the standing necessary to seek relief. Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75-76 (3d Cir. 2010). The injury prong requires a showing of: (1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful. Id., at 76 (quoting Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp., 996 F.2d 425, 429 (3d Cir.

1993)(citation omitted)).  Because the Court finds that Plaintiffs have failed to sufficiently allege Defendant's possession of monopoly power in the relevant market of set-top box distribution, Plaintiffs Section 2 monopolization claim is dismissed with prejudice and the Court need not address Defendant's alleged willful acquisition or maintenance of monopoly power or Plaintiffs' § 2 antitrust standing.

    a.  Possession of Monopoly Power in the Relevant Market

    Monopoly power has been defined as "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable."  Harrison Aire, 423 F.3d at 380 (quoting Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc., 922 F.2d 1317, 1219 (7th Cir. 1991)). Such power can be demonstrated by direct evidence of supracompetitive pricing and high barriers to entry or with structural evidence of a monopolized market.  Id.  Structural indicators of a monopolized market include a firm's possession of a dominant share of a relevant market that is protected by entry barriers.  Id., at 381.  In determining a valid relevant market in which monopoly power is alleged, a Court looks to reasonable interchangeability of use of the relevant product.  See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992)(see also Queen City Pizza, 124 F.3d at 437-38 ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'")(citation omitted).

    Plaintiffs' Third Amended Complaint alleges that Defendant Cablevision willfully acquired and maintained a monopoly in the market for distribution of set-top boxes that provide access to Two Way Services. (Third Am. Compl., at ¶¶ 121-136).  Specifically, Plaintiffs define the relevant product market of set-top boxes to include those boxes distributed by Cablevision to

its subscribers and those boxes that would have been distributed to Cablevision subscribers by other suppliers absent Cablevision's exclusionary conduct. (Id., at ¶ 123). In this product market, the Complaint alleges, Cablevision has total control through willfully acquiring and maintaining exclusive power by imposing a tying arrangement requiring subscribers to rent set-top boxes from Cablevision (Id., at ¶ 122).

Defendant argues that the Third Amended Complaint's "Cablevision-compatible" market is deficient to establish a § 2 claim for two reasons: (1) the Court has already rejected identical market definitions for Plaintiffs' § 2 claim in its prior Opinions granting Defendant's motions to dismiss; and (2) the proposed market is an aftermarket that cannot be sustained as a matter of law. (Def. Br., at 33-36). The Court will address these arguments in turn.

### i. Correction of Pleading Deficiencies from Prior Complaints

Plaintiffs' Original Complaint did not contain a § 2 claim, but in Plaintiffs' subsequent amendments to that Complaint, they have progressively defined the relevant product market for their monopolization claim as follows: 1) "the market for set-top boxes permitting two way communications between Cablevision and its iO TV subscribers" (First Am. Compl., at ¶ 150); 2) "the market for distribution of set-top boxes that can provide access to Two Way Services" (Sec. Am. Compl., at ¶ 147); 3) "the market for distribution of set-top boxes that can provide access to Two Way Services in the area in New York, New Jersey and Connecticut in which Cablevision operates (which falls entirely within the New York DMA)." (Third Am. Compl., ¶ 159). Plaintiffs' first market definition was rejected in this Court's January 14, 2011 Opinion because, inter alia, "the Amended Complaint limits the relevant product market to Cablevision-specific boxes but admits that Cablevision-specific boxes are, in fact, not unique and are interchangeable with other cable boxes available on the market." (Jan. 14, 2011 Op., at 9). A

single brand of a product of service may constitute a relevant market only where "the commodity is unique, and therefore not interchangeable with other products." <u>Queen City Pizza</u>, 124 F.3d at 439.  When Plaintiffs redefined the relevant market to limit it to the distribution of set-top boxes that provide access to Two Way Services in its Second Amended Complaint, this Court found it could not "decipher whether such product market is, once again, limited to those boxes distributed exclusively by Cablevision (i.e., 'Cablevision-specific boxes')." (July 21, 2011 Op., at 12).  The Court pointed to sections of Plaintiffs' Second Amended Complaint which suggested that their amended relevant market was limited to boxes distributed by Cablevision despite their maintenance in their opposition brief to Defendant's motion to dismiss that the amended relevant market was "not limited to boxes distributed by Cablevision." (<u>Id.</u>, at 13).  Thus, the Second Amended Complaint was found to "contain[] no facts which would allow the Court to reasonably infer that Cablevision posses[es] monopoly power in the relevant market of all two-way boxes – that is, all cable boxes that allow two way communications, not simply those cable boxes that allow Cablevision subscribers to access Two Way Services (i.e., Cablevision-specific boxes)." (<u>Id.</u>).

Defendant contends that Plaintiffs have again failed to allege a relevant market beyond the single product market of Cablevision-specific boxes.  (Def. Br., at 33).  Plaintiffs, however, argue that they have clarified the scope of the set-top box distribution market by including "the distribution of **all** set-top boxes that provided, or absent Cablevision's exclusionary conduct, potentially would have provided, access to Two Way Services in the geographic market (Cablevision's service area)." (Pls. Opp'n Br., at 33; <u>citing</u> Third Am. Compl., at ¶¶ 121-122, 129).  Specifically, Plaintiffs claim that their amended market avoids the deficiencies of a "single product market" because it includes Verizon and AT&T's set-top boxes in the relevant market

definition.  (Id., at 34; Third Am. Compl., at ¶ 129).  In fact, Plaintiffs' Third Amended

Complaint "includes boxes that would have been distributed by other outlets, including retail

outlets and secondary sources such as e-Bay, if not for Cablevision's tying conduct, which

successfully prevented these other outlets from being able to distribute boxes to Cablevision's

customers." (Third Am. Compl., at ¶ 123).  Defendant Cablevision, Plaintiffs allege, have

monopoly power in this larger market of set-top box distribution because "Verizon's and

AT&T's combined share of the Two Way Services market in this geographic area is only 10% at

most. . . . Therefore, including boxes distributed by Verizon and AT&T in this geographic area

in the Section 2 Relevant Market does not change the fact that Cablevision clearly maintains a

dominant share (at least 90%) of the market for boxes that provide access to Two Way Services

in this area." (Pls. Opp'n Br., at 33).

     Despite Plaintiffs' attempts to distinguish this third iteration of their § 2 relevant market

from their prior Complaints, this Court finds that Plaintiffs' Third Amended Complaint

maintains an incoherent market definition which simultaneously attempts to incorporate a

broader market of set-top box distribution in a narrow geographic market while also insisting that

"[s]et-top boxes obtained from a source other than Cablevision do not provide access to Two

Way Services because these boxes are prevented from providing access to Two Way Services

due to Cablevision's exclusionary conduct." (Third Am. Compl., at ¶ 127).  As stated in this

Court's January 14, 2011 Opinion, Cablevision-specific boxes are not unique and are

interchangeable with other cable boxes; like Domino's-approved supplies and ingredients

(tomatoes, dough, etc.), they cannot constitute their own, exclusive relevant market, but must

include all interchangeable products not approved by a single brand. (Jan. 14, 2011, at 9-10;

citing Queen City Pizza, 124 F.3d at 440 ("Domino's does not sell a unique product or service.

Franchisees must buy Domino's-approved supplies and ingredients not because they are unique but because they are obligated by contract to do so.")).  Aside from the contractual link limiting Cablevision's subscribers to the rental of the Cablevision-distributed boxes, Plaintiffs set-top box market, as Plaintiffs themselves concede, could include not only those boxes distributed by Verizon and AT&T, but all boxes distributed by Scientific Atlanta and other companies, including those boxes resold online.  Plaintiffs are correct in citing to Third Circuit law which establishes that potential participants in a market may be included in the relevant market since, absent the exclusionary conduct of the alleged monopolist, such participants could have offered interchangeable products.  See SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir. 1978)("[D]efining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.  A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market.").  However, Plaintiffs only define their market share of 90% with respect to those participants that *actually* distribute set-top boxes in the relevant geographic market—namely, Verizon and AT&T—stating no facts which would allow the Court to plausibly determine Defendant's monopoly power in the larger market of potential distributors of cable set-top boxes, from manufacturers to retailers and online resellers, which could dramatically diminish Cablevision's monopoly power.  For these reasons, this Court cannot find that Plaintiffs have sufficiently pled a relevant product market beyond a "single product market," and at best, a Cablevision- and overbuilder-limited set-top box market, so as to survive dismissal under current Third Circuit law.

### ii. Aftermarket Analysis

In <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, the Supreme Court considered the question of whether a defendant's lack of market power in a primary market precludes as a matter of law the possibility of market power in derivative aftermarkets. 504 U.S. 451 (1992). In finding that it does not, the Court pointed to information costs, switching costs and discriminatory pricing which could "lock in" customers who purchase an item within a competitive primary market but face predetermined choices in an aftermarket. <u>Id.</u>, at 477. In <u>Queen City Pizza</u>, the Third Circuit clarified <u>Kodak</u>'s holding as follows: "<u>Kodak</u> does not hold that the existence of information and switching costs alone, such as those faced by the Domino's franchisees, renders an otherwise invalid relevant market valid." 124 F.3d at 439. Specifically, <u>Kodak</u> could be distinguished in cases in which lifecycle pricing assessments are not ruptured or distorted by new and unpredictable policies unforeseen at the time of sale such that a lifecycle price calculations could in fact be incorporated into a purchase decision: "Unlike the plaintiffs in <u>Kodak</u>, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage." <u>Id.</u>, at 440.

Defendant Cablevision likens its Two Way Services subscribers to Domino's franchisees in contending that Cablevision instituted no policy change to rupture the lifecycle pricing assessments of its subscribers with respect to their rental of the set-top box nor did it fail to disclose any information regarding rates and fees at the time Plaintiffs chose to subscribe to Cablevision. For those reasons, Defendant contends, Plaintiffs' § 2 relevant market is an "aftermarket" which must fail as a matter of law. (Def. Br., at 34). Plaintiffs argue that "the market for set-top boxes is not an 'aftermarket' that is dependent on choosing Cablevision Two-Way Services. To the contrary, boxes Cablevision distributes are commodity products that are

widely deployed by many cable operates including Cox, Comcast and Time Warner. Therefore, Cablevision's monopoly over the complimentary product exists only because it had the power and ability to artificially exclude competitive sources of distribution of these commodity boxes." (Pls. Opp'n Br., at 34-35). Further, Plaintiffs distinguish this case from <u>Kodak</u> in that here, Cablevision is alleged to have monopoly power in the primary market of Two Way Services, unlike Kodak which lacked market power in the primary equipment market but was nevertheless found to have possible market power in derivative markets. (<u>Id.</u>, at 35).

In our January 14, 2011 opinion, this Court cited to <u>Queen City Pizza</u> in holding that, to the extent that the Amended Complaint could be construed as stating a claim that an "aftermarket" for Cablevision-compatible cable boxes was the relevant § 2 market, Plaintiffs' § 2 claim "fails as a matter of law inasmuch as the Amended Complaint does not allege that the conduct challenged was not authorized or otherwise disclosed at the time Plaintiff chose to subscribe to Cablevision. . . . Absent a change in [an internal Cablevision] policy [or practice dating back to 2001] (or other circumstances not alleged here), the Court has no basis on which to find plausible a relevant market limited to Cablevision-compatible boxes." (Jan. 14, 2011 Op., at 10). Plaintiffs have made no change in their Third Amended Complaint alleging facts or circumstances which point to a change in policy or other indicators of consumer surprise placing upon them obligations to which they were not previously bound regarding charges or fees unforeseen at the time they signed the subscription agreement with Cablevision. To the extent that Plaintiffs reject an aftermarket definition in their Opposition Brief, or seek to distinguish their case from <u>Kodak</u>, the Court agrees that an "aftermarket" definition of set-top cable box distribution cannot succeed. That is because, while this case may be distinguishable from <u>Kodak</u> with respect to the defendant's alleged market power in the primary market, that cannot save

Plaintiffs § 2 claim under Third Circuit law, which invalidates proposed aftermarkets as a matter of law which were the result of transactions "subjected to competition at the pre-contract stage" at which time a plaintiff "could assess the potential costs and economic risks at the time they signed the . . . agreement." Queen City Pizza, 124 F.3d at 440.  If the contractual restrictions in the Two Way Services package were viewed by Plaintiffs as overly burdensome at the time said package was purchased based on the disclosed rental fee of the set-top box, Plaintiffs could have purchased a different package, or made some alternative entertainment-viewing decisions, for example, by signing on with overbuilders AT&T or Verizon, or even supplementing one-way services attainable through Cablevision or satellite providers with extra-contractual entertainment options in video and gaming.  Further, if Cablevision acted unreasonably when, under the contractual agreement with its Two Way Services customers, it continuously raised its price for the set-top box required to utilize interactive features, Plaintiffs' remedy, if any, is in contract, not under antitrust laws, as Plaintiffs may have a right to sue for breach of the contract on originally agreed-upon terms.  See, e.g. Queen City Pizza, 124 F.23d at 441.

To conclude, Plaintiffs fail to allege a valid relevant market under § 2 of the Sherman Act as required to establish a monopolization claim because Plaintiffs' market as defined is a "single product market" and cannot be properly construed as a valid "aftermarket."  Since Plaintiffs have been afforded multiple opportunities to amend their § 2 claim in light of these deficiencies, the Court denies Plaintiffs' § 2 claim with prejudice.

## 4) Defendant's *Trinko* Argument

Defendant Cablevision revives an argument already rejected by this Court in the instant Motion to Dismiss, asserting that Plaintiffs' antitrust claims are precluded under Verizon Commc's Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004).  Specifically,

45

Defendant claims that Plaintiffs are attempting to improperly convert a regulatory issue into an unlawful tying claim under antitrust law since the FCC was directed to adopt resolutions to promote nationwide availability of set-top boxes. The instant action, Defendant argues, is an attempted end run by Plaintiffs around the FCC's regulatory scheme, and since Plaintiffs allege no recognized antitrust claim, their Complaint should be dismissed on <u>Trinko</u> grounds. (Def. Br., at 38-39). However, since this Court finds that Plaintiffs have sufficiently stated a § 1 tying claim, and the Court has already rejected Defendant's <u>Trinko</u>-based argument on the grounds that "the circumstances at issue in <u>Trinko</u> [are] legally and factually distinguishable from the instant matter" in that "Plaintiff's § 1 claim would exist even in the absence of the FCC's regulation," the Court will not reconsider an argument it has already rejected. (Aug. 18, 2010 Op., at 3-4). Other courts have consistently rejected the application of <u>Trinko</u> to § 1 tying claims alleged in the context of cable MVPD providers and cable set-top boxes that they distribute. <u>See, e.g.,</u> <u>In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.</u>, 2010 U.S. Dist. LEXIS 58417, *22-23 (W.D. Okla. Jan. 19, 2010); <u>Parsons v. Bright House Network, LLC</u>, 2010 U.S. Dist. LEXIS 55277, *26-27 (N.D. Ala. Feb. 23, 2010); <u>Downs v. Insight Communications Company</u>, 2011 U.S. Dist. LEXIS 29616, * 15-16 (W.D. Ky. Mar. 22, 2011).

## 5) Plaintiffs' State Law Claims for Unjust Enrichment

Defendant Cablevision argues that the "[f]ailure of Plaintiffs' federal claims, as before (1/14 Op. 11), requires dismissal of Plaintiffs' state-law claims." (Def. Br. Supp. Mot. to Dismiss, at 39). However, since the Court has found that Plaintiffs have sufficiently alleged a § 1 tying claim, Defendant's motion to dismiss Plaintiff's unjust enrichment claims, which hinge on said tying claim, is denied.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiffs' Complaint is **GRANTED** in part and **DENIED** in part.  Defendant's Motion to Dismiss Plaintiffs' § 1 tying claim and state law unjust enrichment claims is DENIED.  However, Defendant's Motion to Dismiss Plaintiffs' § 2 monopolization claim is GRANTED, and Plaintiffs' § 2 claim is dismissed with prejudice.  An appropriate Order accompanies this Opinion.

DATED: January 9, 2012

_____

Jose L. Linares
United States District Judge