**DEVERO TAUS, LLC**
David M. Taus, Esq.
211 Somerville Road, Suite B
Bedminster, NJ 07921
Telephone: (908) 375-8142
Facsimile: (908) 375-8151

**THE LAW OFFICES OF
JAMES V. BASHIAN, P.C.**
James V. Bashian, Esq.
70 Adams Street, 4th Floor
Hoboken, NJ 07030
Telephone: (973) 227-6330
Facsimile: (201) 488-3330

Attorneys for Plaintiffs
[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARY MARCHESE, ROBYN BUONO, PAUL DAPONTES, JOSEPH FAZIO and ESTHER WEINSTEIN Individually, and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiffs, <br> -v- <br><br> CABLEVISION SYSTEMS CORPORATION, and CSC HOLDINGS, LLC. <br><br>                 Defendants. | Civil Action No. **10-2190 (JLL) (CCC)** <br><br><br> **FOURTH AMENDED CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Gary Marchese, Robyn Buono, Paul Dapontes, Joseph Fazio and Esther Weinstein bring this action individually and on behalf of a Class and Subclasses (as defined below) of all others similarly situated in the states of New Jersey, Connecticut and New York against Defendants Cablevision Systems Corporation and CSC Holdings, LLC. (collectively "Cablevision" or "Defendants"), and allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters.  Plaintiffs' information and beliefs are based upon the investigation conducted by counsel.

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs bring this action both individually and as a class action on behalf of the following class of persons (the "Class"): All persons in the states of New Jersey, Connecticut and New York who subscribed to Two Way Services and paid a monthly rental fee to Cablevision for a cable set-top box during the period April 29, 2004 to the present (the "Class Period").   Excluded from the Class are Cablevision and its officers, directors, employees, affiliates and subsidiaries, and any Judges to whom this case is or may be assigned and any member of those Judges' immediate families, those Judges' law clerks and their immediate families, and any

other judicial officers who are or may be assigned to this case and their immediate families.

2.      Defendants provide cable television services to consumers in the New Jersey, Connecticut and New York tri-state areas.  Among the services provided by Defendants are services provided through bi-directional or "two way communications" between Defendants and Class members' televisions. These services, referred to as "Two Way Services" include: (i) interactive services (including the interactive program guide); (ii) pay-per-view ("Pay TV"); and (iii) Video on Demand ("on Demand").  The "Two Way Services" are provided through a subscription to an iO TV Package. The interactive Two Way Services are an important part of the iO premium package of cable services offered by Cablevision. In fact, the term "iO" stands for "interactive Optimum."

3.      As detailed below, Cablevision has monopoly and/or market power in the tying product market for Two Way Services. (Unless the context dictates otherwise, the term "Two Way Services", as used in this Complaint, includes both the package of interactive services offered by Cablevision, as defined above, and similar packages of interactive services offered by overbuilders such as AT&T and Verizon. Unless otherwise noted, however, the relevant market for Two Way Services does not include Two

Way Services offered by other major incumbent cable companies such as Cox and Time Warner, because no major incumbent cable company operates in the geographic areas in which Cablevision operates.)   These services are not available to Cablevision subscribers unless the subscribers also rent a set-top box from Cablevision; they are not available with a CableCARD. [1]

4.      The geographic scope of the tying product market is the area in which Cablevision operates in New York, New Jersey and Connecticut, which falls within the New York designated market area ("DMA").

5.      Cablevision possessed and maintained market and monopoly power in the tying product market throughout the Class Period. As detailed below, early in the Class Period, Cablevision had no competition whatsoever in the provision of cable services, including Two Way Services, in the area in which it operates, which is entirely within the New York DMA. Two nascent competitors – AT&T and Verizon – only started to provide  cable services, including Two Way Services, in the New York DMA during the Class Period (beginning in 2006) – and according to the FCC, still had only a "minimal" market share as of 2010 as a result of the significant barriers to entry described below. Cablevision nevertheless maintained, and continues to maintain, at or about a 90% share of the overall cable market in the

---

[1] As detailed in footnote two below, the tying product market also includes any other premium cable services that, discovery may reveal, are not available to Cablevision subscribers unless the subscribers rent a cable set-top box from Cablevision.

relevant geographic market throughout the Class Period. Since no other competitors operating in the relevant geographic market, including satellite providers, provide a package of Two Way Services similar to or substitutable for the Two Way Services provided by Cablevision, Cablevision's share of the Two Way Services market exceeds its share of the overall cable market.

6.    The following facts clearly and necessarily demonstrate that Cablevision's domination of the overall cable market in the area in which it operates translates into a similar (or higher) level of domination in the Two Way Services market as well:  (a) Cablevision has possessed 90% or more of the overall cable market in the area in which it operates (which falls entirely within  the New York DMA) throughout the Class Period; (b) over 97% of Cablevision's cable customers subscribe to Two Way Services ; (c) over 99% of Cablevision's premium cable subscribers rent the set-top boxes necessary to access Two Way Services; and (d) the only competitors of Cablevision that provide comparable packages of Two Way Services, AT&T and Verizon, have had no more than a combined 10% of the overall cable market in the New York DMA throughout the Class Period.

7.    These facts compel the conclusion – and easily support the inference – that Cablevision possessed at least a 90% share of the market for

Two Way Services in the area in which it operates (which is entirely within New York DMA) throughout the Class Period. This market share easily exceeds the 30% market share needed to establish market/monopoly power in this Circuit.

8.      In order to access the tying products, subscribers must use a device known as a cable set-top box.  Throughout the Class Period, Cablevision has made it clear that no device, other than set-top boxes, including CableCARDs, is capable of providing Class members access to Two Way Services.  As Cablevision states: "iO TV interactive services are not available with a CableCard.  In order to receive interactive digital services such as iO Video on Demand, and the iO interactive program guide and to order pay per view events using your remote, you must have a digital cable box."

9.      Cablevision's market/monopoly power in the tying product market enabled it to obtain and maintain market/monopoly power in the tied product market – i.e., the distribution of cable boxes that were, or absent Cablevision's illegal tying conduct would have been, usable by Cablevision subscribers to access the tying product (Two Way Services) in the relevant geographic market.  The tied product market is not the market for the manufacture of the boxes; it is the market for the *distribution* of the boxes.

Since Cablevision possesses and exercises the ability to prevent competitors from distributing set-top boxes to its subscribers – and is therefore able to charge supra-competitive prices for those boxes without losing market share – Cablevision has market/monopoly power in the tied product market.

10.    The tied product market does not include all set-top boxes capable of two way communications in the actual world, because not all two way boxes are interchangeable by Cablevision subscribers for the boxes they obtained from Cablevision. (For example, there are certain makes and models of set-top boxes that are capable of two way communications that, nevertheless, are not compatible with Cablevision's cable system, and therefore are not interchangeable for the boxes distributed by Cablevision.) Under controlling Third Circuit law, only products which are reasonably interchangeable (substitutable) for one another for the use to which they are put can be included in the relevant market. Therefore, set-top boxes distributed by other companies which are not usable for the use to which they are put by Cablevision subscribers -- to access Two Way Services (and other services) --  are not in the same relevant market as the set-top boxes distributed by Cablevision, because they are not interchangeable by Cablevision subscribers for the same use as the set-top boxes distributed by Cablevision.

11.    Moreover, the tied product market does not (and cannot) include boxes distributed by other cable companies in geographic areas in which Cablevision does not operate, since Cablevision's illegal tying policies prevent Cablevision subscribers from using boxes distributed by any company other than Cablevision.

12.    It is therefore clear that Cablevision completely dominates the tied product market in the area in which it operates. Even if the boxes distributed by AT&T and Verizon were included in the tied product market – which would be inappropriate because Cablevision prevented those boxes from being interchangeable for use by Cablevision subscribers with the boxes distributed by Cablevision – those companies presently have an aggregate share of less than 10% of the overall cable market in the area in which Cablevision competes (and had even less, or no, market share earlier in the Class Period). Therefore, they cannot have more than a 10% aggregate share of the set-top box market in the area in which Cablevision operates. And clearly, no company other than Cablevision has market power within Cablevision's operating area.

13.    However, the tied product market is not a "one product" market, as Defendants have asserted in this litigation. That is because, under applicable law, the tied product market must include the distribution of

boxes that *would have been substitutable for the boxes distributed by Cablevision absent the exclusionary tying conduct challenged by Plaintiffs in this Complaint*   Therefore, the tied product market in this case includes all Cablevision-compatible boxes that would have been distributed by entities other than Cablevision (and made by entities other than Scientific Atlanta, as well as those made by Scientific Atlanta) absent Cablevision's illegal efforts to exclude competition from all other potential distributors of set-top boxes. (As alleged below, these competitively distributed boxes in the relevant geographic area would have included boxes made by both Scientific Atlanta – which made the boxes distributed by Cablevision and many other cable companies – as well as Cablevision-compatible boxes that would have been made by other manufacturers absent Cablevision's exclusionary tying policy).

14.   Cablevision neither manufactures nor designs the cable set-top boxes that it distributes.  The cable set-top boxes that Cablevision distributes are the same make and model used by many other cable operators, including Time Warner, Cox and Comcast.   In fact, the set-top boxes that are compatible with Cablevision's cable system are neither made by Cablevision, nor are they specific or limited in use to Cablevision

subscribers (absent Cablevision's exclusionary requirement that its subscribers must rent their set-top boxes from Cablevision).

15.    Absent Cablevision's exclusionary tying policy, a substantial market for the distribution of set-top boxes usable by Cablevision subscribers would have developed, and Cablevision premium cable subscribers could have obtained these boxes from sources other than Cablevision at substantially lower prices. Moreover, absent Cablevision's exclusionary conduct, manufacturers other than Scientific Atlanta would have had the ability and substantial incentive to manufacture and distribute competing set-top boxes that also could have been used by Cablevision subscribers rather than the Scientific Atlanta boxes distributed by Cablevision, further increasing consumer choice and reducing prices. However, because it possesses (and possessed throughout the Class Period) market/monopoly power in the tying product market, Cablevision has (and had) the power to force its subscribers to rent, only and exclusively from Cablevision, set-top boxes to access Two Way Services.

16.    Defendants' express requirement that Plaintiffs and members of the Class rent the cable set-top boxes exclusively from Cablevision constitutes an abuse of its market power. Cablevision subscribers are not permitted to use set-top boxes distributed from sources other than

Defendants, despite the fact that set-top boxes distributed by Cablevision are of the same make and model and are equipped with the same technology as is contained in set-top boxes manufactured by Scientific Atlanta and deployed by other cable providers such as Time-Warner, Comcast and Cox. This exclusion of competitive sources of set-top boxes enabled (and enables) Cablevision to reap illegal monopoly profits from its distribution of set-top boxes, at the expense of its subscribers, who are forced to pay higher prices to Cablevision for the set-top boxes they need to access the Two Way Services than they would have paid in the competitive market for the distribution of set-top boxes that would have emerged absent Cablevision's exclusionary conduct.

17.    As detailed further below, Defendants' exclusionary conduct violates Section 1 of the Sherman Antitrust Act (the "Sherman Act"). Regarding Section 1, Defendants' conduct constitutes an illegal tying arrangement, as the tying product (Two Way Services, as defined herein) is separate and distinct from the tied product, and Cablevision forces subscribers of the tying product to agree to rent the tied product exclusively from Cablevision.  By tying Two Way Services to the rental and use of a cable set-top box distributed exclusively by Cablevision, Defendants have

abused their market power in the tying product market, and substantially and unreasonably restrained competition in the tied product market.

18.     By substantially and unreasonably restraining competition in the market for cable set-top boxes providing access to Two Way Services, Defendants have directly injured -- and continue to injure -- Plaintiffs and members of the Class.

19.     Moreover, Defendants have also violated Section 2 of the Sherman Act. Regarding Section 2, Defendants' artificial exclusion of all other set-top boxes capable of providing access to Two Way Services, including boxes of the exact same make and model as those rented from Cablevision (simply because those boxes are not distributed by Cablevision) enabled (and enables) Defendants to create and maintain a monopoly in the market for the distribution of set-top boxes providing access to Two Way Services in the area in which Cablevision operates in New York, New Jersey and Connecticut.

20.     But for Cablevision's exclusion of all set-top boxes other than those distributed by Cablevision, a competitive market for the distribution of set-top boxes would have developed, and would have led to lower prices and/or better boxes.

21.    Cablevision achieved this exclusion, and its resulting monopoly power in the market for the distribution of set-top boxes providing access to Two Way Services, not by developing a better set-top box, but rather by artificially excluding competition from equivalent (or superior) set-top boxes.

22.    Absent Defendants' exclusionary and anticompetitive conduct, Plaintiffs and members of the Class would have been -- and would be -- able to acquire cable set-top boxes that provide access to Two Way Services at a cost substantially lower than the rental fees they are forced to pay to Defendants under the current anti-competitive market conditions caused by Defendants. That is because, absent Defendants' exclusionary conduct, a robust and competitive market would have developed to supply the 6 million or more set-top boxes that could provide access to Two Way Services. Absent such exclusionary conduct, there would have been substantial demand for competitively priced set-top boxes from sources or outlets other than Cablevision, and there would have been numerous manufacturers and retail outlets ready, willing and able to meet such consumer demand. Such a competitive market would have resulted in lower prices, greater choice and more innovation for consumers.

23.     Defendants' past and continuing exclusionary and anticompetitive conduct constitutes an impermissible and unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the wrongful acquisition, enhancement and maintenance of a monopoly, in violation of Section 2 of the Sherman Act.  These violations of the Sherman Act caused injury to Plaintiffs and the members of the Class, in violation of Section 4 of the Clayton Act, 15 U.S.C. § 15.  Defendants' misconduct has, and will continue to have, a substantial adverse competitive effect upon interstate commerce and has, and will, continue to inflict direct economic injury upon Plaintiffs and members of the Class.   Defendants' tying arrangement also violated the New Jersey, Connecticut and New York state common laws of unjust enrichment.

## **THE PARTIES**

24.     Plaintiff Gary Marchese is, and at all relevant times was, a citizen of the State of New Jersey.  At all times relevant hereto, Plaintiff Marchese subscribed to Two Way Services (through his subscription to an iO TV Package).  As required by Cablevision to access those Two Way Services (each television set requires its own set-top box), Plaintiff Marchese pays Defendants $20.10 per month in rent for three cable set-top boxes ($6.70 per box).

25.     Plaintiff Robyn Buono is, and at all relevant times was, a citizen of the State of New York, residing in Merrick, New York.  At all times relevant hereto, Plaintiff Buono subscribed to Two Way Services (through her subscription to an iO TV Package).   As required by Cablevision, to access the Two Way Services, Plaintiff Buono pays Defendants $26.80 per month in rent for four cable set-top boxes ($6.70 per box).

26.     Plaintiff Paul Dapontes is, and at all relevant times was, a citizen of the State of New York, residing in Farmingville, New York.  At all times relevant hereto, Plaintiff Dapontes subscribed to Two Way Services (through his subscription to an iO TV Package).  As required by Cablevision to access Two Way Services, Plaintiff Dapontes pays Defendants $20.10 per month in rent for three cable set-top boxes ($6.70 per box).

27.     Plaintiff Joseph Fazio is, and at all relevant times was, a citizen of the State of Connecticut, residing in Wilton, Connecticut.  At all times relevant hereto, Plaintiff Fazio subscribed to Two Way Services (through his subscription to an iO TV Package).  As required by Cablevision to access Two Way Services, Plaintiff Fazio pays Defendants $20.10 per month in rent for three cable set-top boxes ($6.70 per box).

28.     Plaintiff Esther Weinstein is, and at all relevant times was, a citizen of the State of New York, residing in Hewlett, New York.  At all times relevant hereto, Plaintiff Weinstein subscribed to Two Way Services (through her subscription to an iO TV Package).  As required by Cablevision to access Two Way Services, Plaintiff Weinstein pays Defendants $19.53 per month in rent for three cable set-top boxes ($6.51 per box).

29.     Defendant Cablevision Systems Corporation is a Delaware corporation, with its principal place of business located at 1111 Stewart Avenue, Bethpage, New York 11714.  Cablevision Systems Corporation owns all of the outstanding common stock of CSC Holdings, LLC. According to its website, www.Cablevision.com, "Cablevision Systems Corporation is one of the nation's leading telecommunications and entertainment companies, with a portfolio of operations which includes a full suite of advanced digital television, voice and high-speed Internet services, publishing and interactive media, world-renowned entertainment showplaces, professional sports teams, and popular national and regional programming networks."

30.     Defendant CSC Holdings, LLC ("CSC") is a Delaware corporation, with its principal place of business located at 1111 Stewart Avenue, Bethpage, New York 11714.  CSC is a wholly owned subsidiary of

Cablevision Systems Corporation.   CSC operates cable programming networks, entertainment businesses, telecommunications companies and a newspaper publishing business.

31.     Cablevision Systems Corporation and CSC are collectively hereinafter referred to as "Cablevision" or "Defendants."

## VENUE AND JURISDICTION

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, in that Plaintiffs, on their own behalf and on behalf of the Class, assert claims under the Sherman Act, 15 U.S.C. § §1 and 2.  This Court has supplemental jurisdiction over the state law-based claims asserted herein pursuant to 28 U.S.C. § 1367.

33.     Venue is proper in this Court under 15 U.S.C. § 22 because Cablevision transacts substantial business activity in this District.  Further, Cablevision committed the illegal and anti-competitive acts complained of herein in this District.

## SUBSTANTIVE ALLEGATIONS

**Cablevision and the Multi-Channel
Video Programming Distribution Market**

34.     Cablevision provides service to approximately 3 million video subscribers in the states of New Jersey, Connecticut and New York.  Nearly

97% of these customers currently subscribe to Two Way Services (through an iO TV Package subscription).

35.    As detailed below, a variety of barriers to entry and growth enable Cablevision to maintain monopoly, market and substantial economic power in the tying product market (the market for Two Way Services, as defined herein). .

36.    As set forth in greater detail below, Cablevision has abused its market power in the tying product market by, *inter alia*, tying Two Way Services to the rental of cable set-top boxes distributed exclusively by Cablevision. This tying arrangement allowed Cablevision to improperly achieve market/monopoly power in the tied product market, i.e., the market for the distribution of cable set-top boxes that provide (or absent Cablevision's illegal tying conduct would have provided) access to Two Way Services.

**Elements of Plaintiffs' Section 1 Tying Claim**

1. **The Tying and Tied Products Are Separate and Distinct Products**

    a. **The "Tying" Product: Two Way Services**

37.    Class members obtain Two Way Services through one of Cablevision's iO TV Packages.  These Two Way Services are interactive services that are an important component of the iO TV Packages. In fact, as

stated on the user guide for the Scientific Atlanta set-top boxes that subscribers are required to rent from Cablevision, the term "iO" itself stands for "interactive Optimum."

38.     According to Cablevision's website, the "interactive services" provided by Cablevision include the interactive program guide, interactive games, Pay TV and On Demand. These services are also known as and are defined herein as "Two Way Services."

39.     Subscribers must rent a cable set top box exclusively from Cablevision to access Two Way Services.

40.     Because access to Two Way Services requires a cable set-top box, Two Way Services is the "tying" product. [2]

---

[2] In the alternative, the tying product market consists of the Two Way Services *plus* any additional premium cable services which are (or were) not available with a CableCARD during the Class Period. In Plaintiffs' view, there is an ambiguity in Cablevision's current website as to whether there are certain "Switched Digital Video Services" that cannot be accessed with a CableCARD. The website has a heading entitled "Switched Digital Video Services Not Available with CableCARD." See Exhibit A to this Cpt; Exhibit A to 2d Amd. Cpt. Yet this section of the website also states these services can be received with either a digital cable box "or a Tivo/Moxi HD DVR equipped with a CableCARD and Tuning Adapter."

Adding to the ambiguity, another section of Cablevision's website states that "A digital cable box or HD digital cable box is required for each television set to receive interactive services, *certain digital channels and international programming, and seasonal sports packages*." See Exhibit B to this Cpt. No mention of a CableCARD is made in this section of the website; it simply says that a cable box or HD cable box is required to obtain these services, including certain digital channels and international programming, and seasonal sports packages", in addition to interactive services.

Discovery is necessary to determine the full scope of premium cable services that have not been available to subscribers without a set-top box (i.e., with only a CableCARD) at various times during the Class Period. For example, it may be that subscribers are currently able to access certain services with a CableCARD, and certain periods where they could not access those same services without a set-top box. This may explain why Cablevision's 2004 website does not

### b. The "Tied" Product: Cable Set-Top Boxes<br>That Provide Access to Two Way Services

41.     The requirement that subscribers must rent cable set-top boxes

from Cablevision in order to access its Two Way Services is set forth on

Cablevision's website, which states in relevant part:

> **A digital cable box or HD digital cable box is required for each television set to receive interactive services….**

*See* http://www.aitrk.optimum.com/details.jsp?note=io_details (last
visited March 2, 2011).

Similarly, Cablevision's website says that the following "two way" digital

services are not available with a CableCARD: "Video on Demand, iO

interactive program guide, iO Games, and the ability to order Pay Per View

events using your remote." The website goes on to say that "**A digital cable

box is <u>required</u> to receive these features**."

42.     Because Class members must rent a cable set-top box from

Cablevision to access the Two Way Services, a cable set-top box that

---

mention "a Tivo/Moxi HD DVR equipped with a CableCARD and Tuning Adapter", or any
similar device; it simply says, without qualification, that "You will need a Digital set-top box –
different than the one you may currently have to receive analog premium channels – to receive
the digital channels, order video on demand services, or listen to digital music channels." See Ex.
C to this Cpt.

For simplicity's sake, Plaintiffs will use the term "Two Way Services" to refer both to the
tying product market defined in paragraphs 37 and 38, as well as the alternative tying product
market defined in this footnote. Under either definition, the tying product market consists of the
premium cable services that were only available with a set-top box, and were not available with a
CableCARD.

provides (or absent Cablevision's illegal tying conduct would have provided) access to Two Way Services is the "tied" product.

43.    The "tying" and "tied" products are separate and distinct products.   Indeed, Cablevision charges Class members separately for the tying and tied products.

### 2. Coercion: Cablevision Forces Class Members Into Renting Cable Set-Top Boxes That Permit <u>Access to Two Way Services Exclusively From Cablevision</u>

44.    Cablevision has engaged in coercive anti-competitive practices by restricting the sources or outlets through which a usable cable set-top box can be acquired by Class members.  Namely, Cablevision requires that Class members rent cable set-top boxes exclusively from Cablevision to access Two Way Services.

45.    Cablevision has conditioned or "tied" access to Two Way Services to the rental of set-top boxes solely and exclusively from Cablevision.

46.    Two Way Services constitute a significant and material portion of the services for which iO TV Package subscribers pay, and provide substantial value to such subscribers.

47.     As a result of Defendants' exclusionary tying conduct, in order to gain access to Two Way Services, Class members have no choice and are forced to rent set-top boxes from Cablevision.

48.     As part of, and as a result of, Cablevision's exclusionary tying conduct, Cablevision has prevented and continues to prevent all other non-Cablevision rented set-top boxes from being viable alternatives to, and substitutable for, the set-top boxes distributed by Cablevision, even though the set-top boxes distributed by Cablevision use the same technology as other set-top boxes available from other sources.  In fact, the set-top boxes that Cablevision requires class members to rent exclusively from Cablevision are of the same make and model as those manufactured by, *inter alia,* Cisco Corporation's Scientific Atlanta subsidiary, which models are also used by other major cable companies including Time-Warner, Comcast and Cox.  Yet, because of Cablevision's conduct, these boxes are not usable by Class members if they are obtained from sources other than Cablevision.

49.     Moreover, as detailed further below, and as Cablevision admits on its web-site, CableCARDs are  neither alternatives to nor substitutes for the set-top boxes distributed by Cablevision because they cannot provide access to Two Way Services.

50.     Therefore, subscribers are coerced into renting set-top boxes exclusively from Cablevision, because, *inter alia*, (a) CableCARDs cannot provide access to Two Way Services; and (b) Cablevision prevents Class members from using set-top boxes that could otherwise provide access to Two Way Services (including devices of the same make and model as Cablevision rents).

51.     In addition, Cablevision only rents set-top boxes to subscribers; it will not sell boxes to subscribers, nor will it allow subscribers to purchase boxes from any other source.

### 3. Cablevision Possesses Substantial Economic Power And/Or Market Power In The Tying Product Market

52.     Cablevision has monopoly power, market power and/or substantial economic power in the tying product market -- the market for Two Way Services. The geographic scope of this market is the area serviced by Cablevision in New York, New Jersey and Connecticut.

53.     This power, as alleged herein, enables Cablevision to engage in and enforce its illegal tying conduct. For example, Cablevision has, *inter alia*, (a) the benefit of the barriers to entry, and employs the "clustering" and contractual strategies, as alleged below; (b) enjoys extremely high market share in the geographic market in which it operates; and (c) requires subscribers of Two Way Services to rent a set-top box exclusively from

Cablevision to access Two Way Services, thereby (together with Cablevision's other exclusionary conduct) willfully preventing competition over set-top boxes.

54.   Cablevision's substantial monopoly power, market power and/or economic power in the tying product market is evidenced by, *inter alia*, the fact that approximately 2.9 million of Cablevision's 3.0 million customers subscribe to Two Way Services through an iO Package. This represents nearly 97% of Cablevision's customers.  Moreover, the FCC has indicated that in the New York designated market area (DMA), in which Cablevision operates, the *market share* of cable operators like Cablevision far exceeds the national average of 63.5% of multi-channel video programming distribution (MVPD) subscriptions.   Indeed, the FCC indicated that, in the New York DMA, cable operators enjoy an 88.5% market share of MVPD subscriptions, the highest of the DMAs.  As the FCC commented on this market share data:

> We note that the data refer to the market share held by "wired cable operators," and thus reflect market share data for incumbent cable operators as well as cable overbuilders.  Given the minimal market share held by overbuilders, however, we believe the data provide a useful estimate of the market share held by incumbent cable operators.

*In re Review of the Comm'n's Program Access Rules and Examination of Programming Tying Arrangements*, MB Docket No. 07-198, First Report

and Order, FCC 10-17 adopted and released on January 20, 2010 (the "January 20, 2010 Report and Order") at ¶ 27, n. 97.

55.     Cablevision's dominant market share numbers for the overall cable market, as set forth above, together with the additional facts set forth below, demonstrate that Cablevision also possesses a dominant share in the market for Two Way Services. Specifically:

■   Cablevision has possessed a 90% or greater share of the overall cable market in the area in which it operates within in the New York DMA throughout the Class Period. Indeed, since Cablevision has repeatedly indicated that it has the highest penetration in the nation, its market share in the Two Way Services market likely exceeds that of the New York DMA, as a whole ;

■   Most of Cablevision's cable customers subscribe to packages that include Two Way Services. In fact, over 97% of Cablevision's cable customers subscribe to Two Way Services as part of a premium cable package. Therefore, Cablevision's share of the overall

cable market is also highly indicative of its share of the market for Two Way Services;

■ Most of Cablevision's premium cable subscribers rent the set-top boxes necessary to access Two Way Services. In fact, over 99% of such subscribers rent set-top boxes from Cablevision. Thus, almost all of Cablevision's cable customers both subscribe to a premium cable package that includes Two Way Services, and rent the equipment (a set-top box) necessary to access these Two Way Services. These facts further evidence, and support the inference, that Cablevision's dominant share in the overall cable market is highly indicative of the fact that Cablevision similarly possesses a dominant share of the Two Way Services market;

■  Only two competitors of Cablevision – AT&T and Verizon -- operate in the geographic areas where Cablevision operates, and provide comparable packages of Two Way Services. As shown above, AT&T and Verizon have had no more than a

combined 10% of the overall cable market in the New York DMA throughout the Class Period. Since the only competitors to Cablevision offering a comparable package of Two Way Services had only a small share of the overall cable market, those competitors could only have a similarly small share of the narrower market for Two Way Services (even in the unlikely event that the percentage of AT&T and Verizon's customers with Two Way Services were higher than Cablevision's extremely high percentage of cable customers with Two Way Services.)   As a result, Cablevision necessarily possessed a dominant share of the market for Two Way Services in the areas in which it operated (in the New York DMA) throughout the Class Period – over 80%, at a minimum. This share easily exceeds the 30% market share needed to establish market/monopoly power in this Circuit.

56.    Additionally, (a) satellite MVPD providers do not offer Two Way Services, and therefore do not compete with Cablevision in the Two

Way Services market; (b) other major incumbent cable operators like Time Warner and Comcast do not compete in the geographic area where Cablevision operates; and (c) contrary to Defendants' position in this litigation, products like internet streaming, Netflix and Xbox do not offer services that are reasonably comparable to, interchangeable with or substitutable for the package of Two Way Services (as well as premium cable services) offered by Cablevision. Indeed, the number of Cablevision's subscribers receiving Two Way Services has increased substantially throughout the Class Period, despite the advent of these purportedly competitive new products. Therefore, these products are not properly included in the tying product market in this case.

57.    Cablevision's dominant share of the Two Way Services market in the area in which it operates throughout the Class Period demonstrates that Cablevision possessed monopoly, market and/or economic power in the tying product market.

58.    In addition to its dominant market share, Cablevision's monopoly, market and/or economic power in the tying product market is also evidenced by the following:

     **a.**    **Cablevision's Ability to Regularly Increase The
                   Total Number of Its Subscribers with Two Way Services
                   While Increasing Its Prices**

59.    Cablevision's monopoly, market and/or economic power in the tying product market are further evidenced by the fact that, even after significantly increasing the price Cablevision charges for subscriptions to premium cable packages that include Two Way Services, Cablevision has not only retained a substantial number of such subscribers, but has regularly increased the number of subscribers with Two Way Services. This is direct evidence of Cablevision's substantial economic power, monopoly power and/or market power.

60.    For instance, Cablevision has instituted the following annual increases of its rates during the Class Period: 2010 + 3.7%, 2009 + 3.5%, 2008 + 4.7%, 2007 + 1.1%, 2006 + 2.3%, 2005 + 2.8%, and 2004 + 3.2%. These rate increases include increases in the rates charged by Cablevision for the premium cable packages which provide Two Way Services. (As alleged above, premium cable packages which include Two Way Services constitute the vast majority of cable packages sold by Cablevision.)

61.    Despite these significant annual price increases, Cablevision has been able to add subscribers with Two Way Services.  For instance, from December 2006 through the end of the Fourth Quarter of 2007, the total number of subscribers with Two Way Services increased by approximately 181,000, or 7.4%.  From December 2007 to the end of the Fourth Quarter of

2008 the total number of subscribers with Two Way Services increased by approximately 208,000, or 7.9%. Further, from December 2008 to the end of the Fourth Quarter of 2009, the total number of subscribers with Two Way Services increased by 56,000, or 2.0%.

62.     Cablevision's monopoly, market and/or economic power in the tying product market is also demonstrated by the fact that, in stark contrast to these significant price increases, Cablevision has not raised rates in those markets where it does not have the market and/or monopoly power that it has in the tying product market -- namely the internet and voice markets during the same time period. As Cablevision revealed in a press release regarding its 2010 rates: "Cablevision Systems said it would raise video rates an average of 3.7% in 2010, but added there would be no increase for voice or high-speed internet service for the seventh consecutive year."

63.     Despite the regular and significant increases of its video rates (while at the same time never raising its telephone and internet rates), Cablevision President and CEO Jim Dolan bragged in February 2010 that Cablevision was still able to maintain its industry leading penetration rates for its video services. Dolan stated:

> Cablevision performed exceptionally well in 2009, especially considering the overall challenging economic environment. The ongoing strength of our core businesses continued to drive the company's results, which included solid revenue growth and

double-digit increases in AOCF for both the fourth quarter and full year. The company also generated 63% more free cash flow in 2009, compared with 2008, and **continued to maintain its industry-leading penetration rates for its video**, voice and high-speed Internet services for yet another year.

(Emphasis added).

64.     Accordingly, Cablevision has been able to continuously increase its total revenue generating units (RGUs) which increased 653,400 for the year ended December 31, 2008.   For the year ended December 31, 2009, Cablevision added 297,700 RGUs, with the increase resulting primarily from the greater number of subscribers to Two Way Services.

65.     Furthermore, despite the nascent entry of fiber optic providers AT&T and Verizon in the area where Cablevision operates, Cablevision has been able to maintain its dominant share and increase its number of subscribers with Two Way Services, while consistently and significantly raising its prices.

   **b.     Cablevision Has Achieved Market Dominance
            In The Areas In Which It Operates**

66.     Cablevision has been able to achieve market dominance by use of the following techniques or strategies.

67.     First, Cablevision has employed a strategy of "clustering" - swapping, partnering and buying up subscribers in geographically consolidated areas.

68.     As a result of this "clustering" approach, Cablevision has been able to dominate service in geographically concentrated areas.  This market dominance, in turn, attracts local broadcasting stations looking to reach the largest number of customers possible.

69.     Second, Cablevision bundles its products – *i.e.*, provides customers with broadband internet access and phone service over the same cable infrastructure that it uses to provide customers with video cable service.   Satellite MVPD providers are not technologically capable of "bundling" products.  As Cablevision states: "We compete with these DBS [satellite] competitors by 'bundling' our service offerings with products that the DBS companies cannot efficiently provide at this time, such as high-speed data service and voice service carried over the cable distribution plant, as well as by providing interactive services that are currently unavailable to a DBS subscriber."  Cablevision 2009 Form 10-K, filed February 25, 2010, at 48.

70.     Third, Cablevision can provide more popular programming options than MVPD satellite providers.   MVPD cable providers, like Cablevision, obtained the right to provide these popular programming options pursuant to programmer-distributor contracts which were executed in the 1990s, long before any MVPD satellite providers existed.

71.    Finally, and importantly, satellite technology differs from that of MVPD cable because it uses a telephone line as an exchange and the receiving unit does not have the ability to transfer information back to the satellite.  Consequently, as the quote above indicates, comparable interactive features accessible through two way communications, such as the Two Way Services, are not available with satellite.   As such, satellite broadcast service is not a reasonable or adequate substitute for Cablevision's Two Way Services.

72.    As a result of the foregoing, Cablevision has been able to establish dominance over MVPD satellite providers.   Furthermore, as a result of the foregoing, Cablevision has been able to establish itself as the most highly penetrated digital cable service provider in the nation.

**c.  There   Are   Significant   Barriers   Preventing   Potential Competitors   From   Entering,   And/Or   Threatening Cablevision's Dominance In, The Tying Product Market**

73.    "Overbuilders" are entities that utilize an existing MVPD cable provider's network in order to offer customers an alternative cable service. AT&T and Verizon are overbuilders.

74.    These aspiring overbuilders have had difficulty successfully entering the cable market due to the existence of significant entry barriers,

including the enormous costs associated with building and maintaining a broadband network infrastructure.

75.     As a condition to entering the premium cable service industry, overbuilders must be able to invest significant capital expenditures on broadband and fiber optic networks, which, according to the National Cable & Telecommunications Association totaled approximately $12.4 billion in 2006 and $13.7 billion in 2007.

76.     Additionally, the ability of overbuilders to price their services at the level necessary to recover these initial expenses is exceedingly low and constrained by the presence of incumbent cable providers, like Cablevision, who, as a result of their incumbency have much lower costs. Consequently, overbuilders have been less successful in keeping pace with broadband technological advances.

77.     An additional barrier to entry into the MVPD cable market is the franchising process by which overbuilders receive permission to build a wireline network, or franchise, in a particular area.

78.     In some areas, the application process for a wireline network is costly and can take up to three years to complete. As a result, overbuilders are often deterred from entering the MVPD cable market due to this lengthy process.

79.     As a result of the foregoing, there have been and are significant barriers to entry into the tying product market. Moreover, even if these barriers did not preclude entry into the market entirely, they significantly limit the magnitude of such entry and the ability of the overbuilders to threaten Cablevision's market dominance.

80.     Indeed, as the FCC has indicated, major incumbent cable operators like Cablevision continue to take steps to frustrate competitive entry by creating additional artificial barriers and higher costs for its rivals, including overbuilders Verizon and AT&T:

> Cable operators continue to have the incentive and ability to withhold or take other unfair acts with their affiliated programming in order to hinder competition in the video distribution market. A vertically integrated cable operator may raise the costs of its MVPD competitors by increasing the price of its affiliated programming or may choose not to sell its affiliated programming to rival MVPDs. As the Commission noted in the *Adelphia Order,* "the integrated firm may be able to harm its rivals' competitive positions, enabling it to raise prices and increase its market share in the downstream market, thereby increasing its profits while retaining lower prices for itself or for firms with which it does not compete." Unfair acts involving cable-affiliated programming may harm the ability of MVPDs to compete with incumbent cable operators, thereby resulting in less competition in the marketplace to the detriment of consumers.

January 20, 2010 Report and Order at ¶ 26.

### d. Cablevision Does Not Compete With Other Major Cable Operators In The Markets In Which It Operates

81.     As   detailed   further   below,   Cablevision   does   not   face competition from the major cable operators that offer Two Way Services, such as Time Warner and Comcast. That is because each of these companies employ the same "clustering" strategy as Cablevision – i.e., they concentrate their cable operations in geographic areas where only one incumbent cable operator has the infrastructure to operate. As a result, Cablevision does not face head to head competition from any major incumbent cable operator in the areas in which it operates in New Jersey, New York or Connecticut.

### 4. Cablevision's Illegal Tying Arrangement Affects A Substantial Amount Of Commerce In The Tied Product Market

82.     Absent the anticompetitive and exclusionary practices alleged above, other outlets for cable set-top boxes that permit access to Two Way Services, including electronics manufacturers and retail outlets, would have successfully entered the market, and would have provided viable alternatives for subscribers of Two Way Services to acquire set-top boxes.

83.     But for Defendants' conduct (which foreclosed customers from using set-top boxes distributed by anyone but Cablevision), the more than 6 million boxes that Class members are forced to rent from Cablevision would have presented, and does present, a highly attractive potential market for set-

top box manufacturers and retail outlets to compete with Cablevision by offering, e.g., lower prices than Cablevision offers in the non-competitive market that has existed throughout the Class Period.

84.     As of December, 2010, Cablevision had approximately 2.9 million subscribers to Two Way Services who rented over 6 million cable set top boxes that provide access to Two Way Services.  At monthly rental fees of approximately $6.70 per box per month, Cablevision reaps annual set-top box rental revenues of approximately $500 million.  The competitive price of set-top boxes would have been substantially lower than the supracompetitive prices charged by Cablevision.

85.     Moreover, but for the coercive tying arrangement, which required Class members to rent their cable set top boxes from Cablevision, there would have been enormous demand among subscribers with Two Way Services for set-top boxes.  Cablevision would have had to lower its prices for cable set top boxes in order to compete. As a result, such competition would have resulted in more choices and lower prices for consumers, including Plaintiffs and members of the Class.

86.     Cablevision's practice of forcing consumers to rent cable set-top boxes only from Cablevision has prevented electronics manufacturers

and retail outlets from selling or renting cable set-top boxes that could access Two Way Services directly to subscribers with Two Way Services.

87.    Absent the exclusionary conduct of Defendants, consumer electronics manufacturers would have similarly seen a large competitive opportunity in the market for cable set-top boxes and would have entered the market with technologically equivalent but lower priced set-top boxes. There would have been significant demand among consumers for these boxes.

88.    By preventing electronics manufacturers and retail outlets from selling or renting cable set-top boxes that could otherwise provide access to Two Way Services (but for Defendants' exclusionary conduct) directly to the millions of Class members, Cablevision has affected competitors' total volume of sales of cable set-top boxes that permit access to Two Way Services by far more than a *de minimis* amount in absolute dollars. Cablevision, alone, generates approximately $500 million per year in revenue from the six million cable set-top boxes it forces class members to rent from it exclusively.  Those revenues provide a steady and substantial stream of income for Cablevision.  Absent the tie, and in a competitive market, Cablevision's income stream from box rental would decrease dramatically.   If not for Cablevision's illegal tying arrangements, manufacturers of, and retail outlets for, cable set-top boxes permitting access

to Two Way Services would have been able to enter the Tied Product market.

**5.  Cablevision's Tying Arrangement Has Caused Harm To Subscribers That Rent Set Top Boxes Necessary To Access Two Way Services**

89.    Plaintiffs and members of the Class all rent from Cablevision the set-top boxes that, because of Cablevision's coercive tying conduct, are necessary to access Two Way Services.

90.    Class members are not able to rent or purchase cable set-top boxes from any source other than Cablevision, including cable set-top box manufacturers, retail outlets or second-hand distributors, because Cablevision artificially excludes and forecloses such boxes from accessing Two Way Services.

91.    To the extent a subscriber tried get around this restriction by obtaining a cable set-top box from a source other than Cablevision, the subscriber will have engaged in a futile act because, as a result of Cablevision's naked exclusion, that set-top box will not access Two Way Services.  The result would be the same even if that person is able to obtain, for instance, a used or refurbished cable set-top box available on "eBay" of the same make and model as the boxes that Cablevision rents.  The reason such otherwise substitutable cable set-top boxes do not provide access to

Two Way Services is not because they are inferior or lack a critical technology, but rather because Cablevision, to enforce its tying arrangement, will artificially exclude and foreclose those boxes from providing access to Two Way Services.

92.     Cablevision charges considerable fees per month to Plaintiffs and members of the Class for each cable set-top box that it distributes.  The price which Cablevision charges Plaintiffs and members of the Class for the rental of cable set-top boxes far exceeds the price they would have paid to acquire cable set-top boxes in the competitive market which would have existed absent Cablevision's illegal and anticompetitive conduct. Although the amount of the overcharges incurred by Plaintiffs and members of the Class (and the amount of money Cablevision illegally earned) from this conduct cannot be determined without discovery, such amounts are quite substantial, as Plaintiffs and members of the Class have been forced to incur overcharges on millions of cable set-top box rentals during the Class Period, which currently provide Cablevision with annual rental income of approximately $500 million.

93.     Cablevision's illegal tying arrangement has also harmed Plaintiffs and members of the Class by limiting consumer choice and dampening competition and innovation in the market for cable set-top boxes,

which innovation and competition would have led to significantly lower prices and better products.

94.     Plaintiffs and members of the Class could not have reasonably avoided the anticompetitive effects of Defendants' tying conduct because (a) other cable operators or fiber optic providers either do not operate in the areas in which Cablevision operates, or they engage in tying conduct similar to Cablevision's conduct as alleged herein; and (b) satellite MVPD operators cannot provide comparable Two Way Services.

**6. The CableCARD Is Not A Viable Substitute To The Cable Set-Top Box For Use With The Tying Product, Because The CableCARD Does Not Perform Two Way Communications, And Therefore Does Not Provide Access To Two Way Services**

95.     CableCARDS are, by definition, not substitutes for cable set-top boxes that permit access to Two Way Services because, as explained in more detail below, CableCARDS do not allow subscribers of Two Way Services to access Two Way Services.

96.     Unlike a cable set-top box, which performs unscrambling and decrypting on its own, a CableCARD must be inserted into a separate compatible device, where the CableCARD can then perform its unscrambling and decrypting functions.

97.     CableCARDs are unable to provide the two way communications that a cable set-top box provides, and are thus unable to provide access to Two Way Services.

98.     Cablevision discusses the limited features of the CableCARD on its website, informing consumers that Two Way Services are not available through use of a CableCARD.  For instance, Cablevision states:

> **Interactive Features Not Available with CableCARD**
> **This includes "two-way" digital services such as Video on Demand and the iO Channel Guide.**
>
> The following digital services are **not** currently available with your CableCARD device:
>
> o  Video on Demand
> o  iO interactive program guide
> o  iO games
> o  Ability to order Pay Per View events using your remote.
>
> **A digital cable box is required** to receive these features.

*See* Exhibit A, attached hereto.  (Emphasis added).

99.     The CableCARD's inability to act as a substitute for a cable set-top box is also evidenced by the very small number of CableCARDs that consumers chose to rent from Cablevision.   Although Cablevision has approximately 2.9 million subscribers to Two Way Services, as of December 31, 2010, Cablevision only had approximately 18,000 customers (less than

1% of such customers) who use its CableCARDs. Therefore, more than 99% of Cablevision's cable customers rent set-top boxes from Cablevision.

### 7. **Monopoly Power and Market Definition**

100.   The tying product market in this case is the market for Two Way Services. This market includes the Two Way Services provided by incumbent premium cable operators and fiber optic providers that operate in the area where Cablevision operates (Cablevision, Verizon and AT&T), but does not include products provided by satellite providers, as satellite providers have not been and are not capable of offering comparable Two Way Services, as Cablevision has repeatedly admitted. As Cablevision states in its 2009 10-K, Cablevision "provid[es] interactive services that are currently unavailable to a DBS subscriber." Nor does it include the Two Way Services offered by other major incumbent cable companies such as Cox and Time Warner, since those companies do not operate in the geographic area where Cablevision operates.

101.   Throughout the Class Period, Cablevision has had the power to maintain the price of the tying product at supra-competitive levels profitably without losing substantial sales. In fact, as demonstrated in paragraph 59 above, Cablevision has been able to consistently and significantly raise the prices of its premium cable package subscriptions (which include Two Way

Services) while maintaining, and even increasing, the number of its subscribers, including the number of subscribers with access to Two Way Services.  This demonstrates that Cablevision has (and had) power over prices in the Two Way Services market specifically, as well as market power over the overall cable market generally, in the area in which it operates. This power over pricing is significant evidence of Cablevision's market power in the tying product market.

102.   In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by Class members to other products would not be significant.

103.   Subscriptions that provide access to Two Way Services do not exhibit significant, positive cross-elasticity of demand with respect to price with other products.

104.   Similarly,  Cablevision has (and had) a dominant market share in the market for Two Way Services specifically, as well as a dominant market share in the overall cable market generally, in the area in which it operates.  As demonstrated above, including Paragraph 54, the facts alleged by Plaintiffs demonstrates Cablevision's dominant market share in the more narrow tying market for Two Way Services, in addition to the broader overall cable market.

105.   Moreover, Cablevision's Two Way Services are not reasonably interchangeable with other products that are reasonably available in the areas in which it operates. As a result of this and other factors, including the significant barriers to entry faced by potential competitors in the tying product market as alleged herein, Cablevision has achieved substantial dominance in the areas in which it operates throughout the Class Period.

106.   There are several factors that enable Cablevision to obtain and maintain its dominant market position in the areas in which it operates in New York, New Jersey and Connecticut. First, Cablevision does not face any appreciable competition from major cable operators, such as Time Warner and Comcast, in the areas in which it operates, as each of these major cable companies employ the same "clustering" strategy, in which they concentrate their cable operations in geographic areas where only one incumbent has the infrastructure to operate.

107.   For instance, in New Jersey, there are only three major cable companies: Cablevision, Time Warner and Comcast, which make up the entire membership and Board of Directors of the New Jersey Cable Telecommunications Association.   As the materials available from that

association's website indicate (www.cablenj.org), those companies do not compete against each other in any areas of New Jersey.

108.   Similarly, in New York, because the service areas of different cable companies are divided up and do not overlap, cable companies such as Cablevision, Time Warner and Comcast, do not compete with one another for the same customers.

109. Likewise, each of the cable companies in Connecticut, including Cablevision, do not compete with one another because they each have their own service areas, which do not overlap with other cable companies.

110.   Second, the clustering and bundling strategies described above, as well as the long term contracts which enable cable operators to offer more popular programming options, were (and are) effective in enabling Cablevision -- like other cable providers -- to achieve and maintain its market dominance in the areas in which it operates.

111.   Third, as detailed above, there are significant barriers to entry preventing potential cable MVPD providers, including "overbuilders," from successfully entering the areas in which Cablevision operates, and/or threatening Cablevision's dominance. These barriers to entry include the enormous costs associated with building and maintaining a broadband

network infrastructure; the cost and pricing advantages that incumbent cable providers like Cablevision have vis-à-vis overbuilders; and the significant time and expense associated with the franchising application process.

112.   Because of these industry-wide factors, strategies, techniques and barriers to entry, Cablevision has achieved substantial dominance in the tying product market in the areas in which it operates.

113.   Cablevision enjoys upwards of 90% market share in the areas in New York, New Jersey and Connecticut in which it operates. This is based, *inter alia*, on the fact that: (a) the FCC has indicated that cable MVPD providers in the New York DMA, including Cablevision, enjoy, and take advantage of, the same industry factors, strategies and techniques, and barriers to entry detailed above and that their market shares in the New York DMA approximates 88.5%; and (b) Cablevision has repeatedly touted its "industry-leading penetration rates" among MVPD providers (*See e.g.*, Cablevision's Feb. 25, 2010 Press Release) which means its share likely even exceeds the 88.5% share found by the FCC. In addition, the 88.5% FCC figure for the New York DMA includes satellite providers who are not able to provide Two Way Services.  As a result, Cablevision's market share of subscription with Two Way Services may exceed 90%.

114.   The Two Way Services market is distinguished by its unique features and the multitude of services offered.   Cablevision's Two Way Services provide consumers with the ability to select from and view a variety of programming.   Subscribers have control over these viewing options simply by using their television remote controls without having to even leave their couch.

115.   Video game systems (such as X-box) and video rental services (such as Netflix or Blockbuster) are not reasonable substitutes for Two Way Services, which provide a combination of valuable services in a convenient, comprehensive format. Two Way Services are not reasonably interchangeable with piece-meal combinations of video game or video rental services.  Two Way Services are unique products because they allow consumers to navigate through a vast array of programming options and choose the options that suit them best in a given moment. Subscribers can choose from a live sporting event in high definition, a brand new television show, or specialized coverage of a breaking current event.    Video rentals, whether from a brick and mortar store, a mail service, on an internet site, do not offer consumers any of those options. Moreover, consumers cannot access video rentals from brick and mortar stores or Netflix on a sudden whim, as they can with Two Way Services. In addition, brick and mortar rental stores like Blockbuster have been

reducing staff, reducing hours and closing in recent years while the number of Two Way Services subscribers and the prices of subscriptions have increased consistently.  These products are functionally and substantively different from Two Way Services and are not reasonably interchangeable with Two Way Services.

116.   Websites or internet vendors did not offer a comparable producr to interactive Two Way Services during the Class Period, and still do not today.  These websites have a much smaller library of offerings than cable MVPD companies, in part, because content providers did not view the internet as a secure forum for distributing their copyrighted material.  Video over the internet was also frequently of a poorer visual quality, took longer to download, and was more prone to interruptions than cable MVPD.  Moreover even if such websites were a substitute, they were nascent ventures during the Class Period and had an extremely limited customer base.

117. Cablevision sold subscriptions at prices well in excess of marginal costs and competitive prices and enjoyed healthy profit margins.  Cablevision has been able to regularly and significantly increase prices while retaining and increasing subscriptions with Two Way Services.  Besides generating approximately $3 billion or more annually in revenue

from subscriptions, Cablevision also reaps another nearly $500 million annually in revenue from the tied product, set-top box rentals.

118.   The geographic scope of the tying product market is the area in New York, New Jersey and Connecticut in which Cablevision operates. This concentrated geographic area is entirely within the New York DMA. The strategies, techniques, industry factors and barriers to entry detailed above apply industry-wide, and therefore apply in all of the areas in which Cablevision operates. Moreover, Cablevision's pricing and tying policies, as described above, are company-wide, and apply in all of the areas in which Cablevision operates. Likewise, the market dominance that Cablevision enjoys because of these industry-wide and company-wide factors exists throughout the areas in which Cablevision operates.

119.   In fact, the FCC has indicated that, in the New York DMA in which Cablevision operates, the market share of cable operators far exceed the national average.   The FCC specifically cited the New York DMA, indicating that the cable share of the MVPD market is 88.5% ("New York DMA (No.1; 88.5 percent cable market share)"). As the FCC commented on this market share data:

> We note that the data refer to the market share held by "wired cable operators," and thus reflect market share data for incumbent cable operators as well as cable overbuilders.  Given the minimal market share held by overbuilders, however, we

> believe the data provide a useful estimate of the market share
> held by incumbent cable operators.

January 20, 2010 Report and Order at ¶ 27, n. 97.   Cablevision has repeatedly represented that its penetration rate is the highest in the United States, thus likely exceeding 88.5% for the New York DMA as a whole.

120.   The limited incursion of overbuilders and satellite operators into the areas in which Cablevision operates does not change the fact that Cablevision dominates in those areas. For example, certain fiber optic cable providers have recently begun offering two way services in certain areas in which Cablevision operates. Verizon began offering such services in parts of New Jersey and New York in or about 2006, and AT&T began offering such services in parts of Connecticut in or about 2007. However, these providers have not yet been able to obtain sufficient market share to threaten Cablevision's dominance and market power in the areas in which Cablevision operates, as alleged above.  Indeed, in the FCC's 2010 report quoted above, the FCC described the share held by overbuilders in the New York DMA as "minimal."

<u>**Elements of Plaintiffs' Section 2 Claim**</u>

> **1. Cablevision Has Willfully Acquired And Maintained A Monopoly In The Market For Distribution Of Set Top Boxes That Provide Access To Two Way Services**

121. The relevant product market for purposes of the Section 2 monopolization claim is the market for distribution of set-top boxes that provide access to Two Way Services in the area in which Cablevision operates in New York, New Jersey and Connecticut (the "Section 2 Relevant Market").

122. The Section 2 Relevant Market is not limited to "Cablevision-specific boxes." Cablevision does not manufacture any cable boxes; it simply distributes boxes made for it by Scientific Atlanta, a subsidiary of Cisco. The same boxes that Cablevision distributes – indeed, the same make and model numbers of boxes made by Scientific Atlanta are even distributed by other cable companies, such as Time Warner, Cox and Comcast. The only reason why these boxes cannot be used to access Cablevision's Two Way Services is that Cablevision imposed its tying arrangement, which required subscribers to rent their boxes from Cablevision. Absent this tying arrangement, and Cablevision's associated tying conduct whereby it prevented otherwise compatible boxes from accessing its cable system unless the box was distributed by Cablevision, these and other cable boxes

that were capable of accessing Cablevision's Two Way Services would have been available.

123.   The Section 2 Relevant Market is not a "single product market" because it is not limited to boxes distributed by Cablevision. It also includes boxes that would have been distributed by other outlets, including retail outlets and secondary sources such as e-Bay, if not for Cablevision's tying conduct, which successfully prevented these other outlets from being able to distribute boxes to Cablevision's customers.   Relevant markets are not limited to products that are *actually* supplied to consumers; they also include substitutable products that *potentially* would have been supplied absent the challenged conduct. Therefore, the relevant market here *does* include both (a) boxes distributed by Cablevision to its subscribers and (b) boxes that would have been distributed to Cablevision subscribers by other suppliers absent Cablevision's exclusionary conduct. In other word*s, the t*ied market in this case includes the Cablevision-compatible boxes that *would have* been distributed by entities other than Cablevision (and made by entities other than Scientific Atlanta*) abs*ent Cablevision's illegal – but successful – efforts to exclude competition from all other potential distributors of set-top boxes usable by Cablevision's premium cable subscribers. The tied market does *not*, however, include all set-top *boxes c*apable of two way

communications because not all two way boxes are in*terchangeab*le with, or substitutable by,  subscribers for the boxes they obtained from Cablevision. Unde*r con*trolling Third Circuit law, only reasonably *interchangeable* or *substitutable* products can be included in the relevant marke*t*.

124.   Therefore, boxes that are generally capable of two way communication*s,* but were not usable by Class Members, are not reasonable substitutes for the boxes distributed by Cablevision, and therefore are not included in the relevant market in this case.

125.   By engaging in the exclusionary conduct alleged above, Cablevision wrongfully acquired, enhanced and maintained a monopoly in the Section 2 Relevant Market. Cablevision acquired its monopoly power in this market by art*if*icially excluding and foreclosing the use of set-top boxes that could provide access to Two Way Services that were distributed by any entity other than Cablevision. By taking such steps, Cablevision effectively excludes all actual and potential competition for the distribution of set-top boxes that could provide access to Two Way Services, because such steps ensure that no set-top boxes other than those distributed by Cablevision will provide access to Two Way Services – i.e., will be substitutable for the boxes distributed by Cablevision.  Thus, every other set-top box (even those of the exact same make and model as those that Cablevision forces its Two

Way Services subscribers to rent) is rendered useless by Cablevision's exclusionary conduct so that Cablevision can maintain its monopoly in the Section 2 Relevant Market.  But for Cablevision's illegal exclusion, other set-top boxes, including those of the same make and model as Cablevision, would provide access to Two Way Services.

126.   Cablevision achieved this exclusion, and its resulting monopoly power in the Section 2 Relevant Market, not by developing a better set-top box, but rather by artificially excluding and blocking competition from equivalent (or superior) set-top boxes that are otherwise capable of providing access to Two Way Services. The set-top boxes distributed by Cablevision use the same standard technology employed throughout the cable industry. Indeed, the third party that manufactures the set-top boxes distributed by Cablevision (Scientific Atlanta, a subsidiary of Cisco) sells substantially the same set-top box to other cable operators. Because the set-top boxes distributed by Cablevision are the same as those deployed on many other cable systems, the only reason that Cablevision can maintain its monopoly is by excluding set-top boxes that it does not distribute from providing access to Two Way Services.

127.   Set-top boxes obtained from a source other than Cablevision do not provide access to Two Way Services because these boxes are prevented

from providing access to Two Way Services due to Cablevision's exclusionary conduct, as alleged herein.  As a result, Cablevision is able to maintain its monopoly.

128.   Absent Cablevision's exclusionary conduct, (i) a robust and competitive market for set-top boxes that provide access to Two Way Services would have developed in the area in which Cablevision operates, (ii) there would have been substantial demand for competitively priced set-top boxes from sources or outlets other than Cablevision, and (iii) there would have been numerous manufacturers and retail outlets ready, willing and able to meet such consumer demand. Such a competitive market would have resulted in lower prices, greater choice and more innovation, all to the consumer's benefit.

129.   As a result of Cablevision's exclusionary conduct as alleged herein, Cablevision obtained and maintained a dominant share of the Section 2 Relevant Market throughout the Class Period. The set-top boxes distributed by AT&T and Verizon (neither of which have market power) in the geographic area in which Cablevision operates do not prevent Cablevision from  possessing a dominant share of the Section 2 Relevant Market.

130.   Absent Cablevision's exclusionary conduct as alleged herein, Plaintiffs and members of the Class would have paid substantially less for their set-top boxes capable of two way communications than they actually paid because a competitive market would have developed for such boxes.

131.   The purpose and effect of Cablevision's conduct was to exclude competitors in the Section 2 Relevant Market.

132.   Cablevision had monopoly power in the Section 2 Relevant Market, in that Cablevision possessed the power to exclude competition and charge supra-competitive prices in that market. Cablevision's monopoly power in this market is demonstrated by, *inter alia*, the fact that Cablevision was, in fact, successful in excluding all competition in that market, allowing it to charge and collect rental fees for set-top boxes providing access to Two Way Services that were far above the costs at which Plaintiffs and Class members would have been able to obtain absent Defendants' exclusionary conduct.

133.   As a result of Cablevision's exclusionary conduct, set-top boxes distributed by any entity other than Cablevision are not alternatives to, or substitutes for, set-top boxes distributed by Cablevision, because Cablevision affirmatively prevents any box other than those it distributes from accessing Two Way Services.

134.   As alleged above, Cablevision also dominates the market for Two Way Services.  As a result, subscribers could not avoid Cablevision's anticompetitive conduct by switching to another provider that offers comparable Two Way Services.

135.   Cablevision's conduct, as alleged herein, provided no pro-competitive effect or benefit to consumers. In contrast, Cablevision's exclusionary conduct caused enormous anticompetitive effects, including but not limited to hundreds of millions of dollars in aggregate overcharges that Class members were caused to incur on the rental of their set-top boxes from Cablevision.

136.   In addition, Cablevision's conduct reduced consumer choice and dampened incentives to innovate in the set-top box market. As a result of the foregoing, Defendants possess monopoly power in the Section 2 Relevant Market, and acquired, enhanced and maintained that monopoly power by use of exclusionary conduct, in violation of Section 2 of the Sherman Act. Such violations of Section 2 have caused injury to Plaintiffs and all other members of the Class in the form of overcharges, in violation of Section 4 of the Clayton Act.

## PRESERVATION OF CLAIMS

137.  This Third Amended Class Action Complaint is submitted by Plaintiffs in response to, and in conformity with, the guidance set forth by the Court in its August 2010, January 2011 and July 2011 Opinions regarding Defendants' motions to dismiss.  Nevertheless, Plaintiffs hereby preserve the claims and allegations set forth in their prior pleadings including but not limited to Plaintiffs' prior allegations and claims regarding the appropriate tying product, tying market and Cablevision's monopoly, market and/or economic power in those markets.

## CLASS ACTION ALLEGATIONS

138.  Plaintiffs bring this action both individually and as a class action on behalf of the following class of persons: All persons in the states of New Jersey, Connecticut and New York who subscribe to Two Way Services and pay a monthly rental fee to Cablevision for a cable set-top box during the period April 29, 2004 to the present (the "Class Period"). Excluded from the Class are Cablevision and its officers, directors, employees, affiliates and subsidiaries, and any Judges to whom this case is or may be assigned and any member of those Judges' immediate families, those Judges' law clerks and their immediate families, and any other judicial

officers who are or may be assigned to this case and their immediate families.

139.   In addition, and subject to exclusions from the proposed federal law class, defined above, Plaintiffs bring this class action on behalf of themselves and the following subclasses of persons for claims arising under state law and, in alternative to the unitary federal law class, present claims of each Subclass for violations of the Sherman Act.  Members of each Subclass are members of the Class.

a.     Plaintiff Gary Marchese brings this class action on behalf of himself and the following subclass of persons:

> All persons in the State of New Jersey who subscribe to Two Way Services and pay a monthly rental fee to Cablevision for a cable set-top box during the Class Period.

b.     Plaintiff Joseph Fazio brings this class action on behalf of himself and the following subclass of persons:

> All persons in the State of Connecticut who subscribe to Two Way Services and pay a monthly rental fee to Cablevision for a cable set-top box during the Class Period.

c.     Plaintiffs Robyn Buono, Esther Weinstein, and Paul Dapontes bring this class action on behalf of themselves and the following subclass of persons:

All persons in the State of New York who subscribe to Two Way Services and pay a monthly rental fee to Cablevision for a cable set-top box during the Class Period.

140.   Members of the Class and subclasses are so numerous that joinder of all members would be impracticable.  Plaintiffs estimate that there are approximately 2.9 million subscribers of Two Way Services who rented cable set top boxes from Cablevision in New Jersey, Connecticut and New York, the exact number of which is within documents in Defendants' custody and control and can be obtained through discovery.

141.   There are questions of law and fact common to all the members of the Class and subclasses that predominate over any questions affecting only individual members, including:

a.  Whether Defendants violated Section 1 of the Sherman Act 15 U.S.C. §1 by tying Two Way Services to the exclusive rental from Cablevision of cable set-top boxes, thereby creating an anti-competitive market for cable set top boxes and ultimately causing harm to Plaintiffs and members of the Class;

b.  Whether Defendants violated Section 2 of the Sherman Act;

c.  Whether Defendants should be enjoined from further violations of federal laws;

d.  Whether, as a result of Defendants' misconduct, Plaintiffs and members of the Class are entitled to damages as a result of Defendants' violation of federal antitrust laws, and the proper measure of such damages; and

e.  As to the subclasses, whether Defendants were unjustly enriched by accepting or retaining non-gratuitous benefits conferred by Plaintiffs and members of the subclasses despite Defendants' knowledge that the tying of the rental of cable set-top boxes distributed exclusively by Cablevision to Two Way Services was unlawful.

142.   The claims of Plaintiffs are typical of the claims of members of the Class and the subclasses.  Plaintiffs have no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

143.  Plaintiffs will fairly and adequately protect the interests of members of the Class and the subclasses, and have retained attorneys experienced in class action and complex litigation.

144.   A class action is superior to all other available methods for this controversy because:

a.     The prosecution of separate actions by the members of the Class or the subclasses would create a risk of adjudications with respect to individual members of the Class and the Subclasses that would, as a

practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

b.     The prosecution of separate actions by the members of the Class or the subclasses would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants;

c.     Defendants acted or refused to act on grounds generally applicable to the Class and the Subclasses; and

d.     Questions of law and fact common to members of the Class and the subclasses predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

145.   Plaintiffs do not anticipate any difficulty in the management of this litigation.

## COUNT I

**(By Plaintiffs, Individually And On Behalf Of All Members Of The Class, For Violation Of Section 1 Of The Sherman Act – Unlawful Tying)**

146.   Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs.

147.   The Sherman Act makes it unlawful to enter into an agreement in restraint of trade or commerce.  15 U.S.C. § 1.  Congress has granted a private right of action to individuals harmed by violations of this act.  15 U.S.C. § 15.

148.   Plaintiffs on their own behalf and on behalf of the members of the Class, seek to recover damages suffered as a result of Defendants' violations of the Sherman Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

149.   Defendants have illegally sold the tying product, upon the condition that consumers agree to rent the tied product from Cablevision. As detailed above, Defendants affected the tie by forcing subscribers of Two Way Services to rent the cable set-top boxes exclusively from Cablevision in order to access Two Way Services.  For each cable set-top box that members of the Class obtain from Defendants, they are also forced to pay supra-competitive rental fees.

150.   Plaintiffs and members of the Class cannot untie the Two Way Services from the exclusive rental from Cablevision of a cable set-top box.

151.   The tying product is a separate and distinct product from the tied product.  Cablevision charges one fee for the tying product and charges

a separate fee for the tied product. Likewise, the markets for the tying and tied products are separate and distinct.

152.   Defendants have sufficient economic power in the tying product market to enforce the illegal tie and force consumers to accept burdensome terms for the tied product that could not be exacted in a competitive market. Defendants illegally restrained consumers from renting or purchasing the tied product from other sources, thereby creating an anti-competitive market.

153. Defendants'  improper  tying  arrangement  prevents manufacturers and retailers of the tied product from effectively entering the tied product market, and has thereby harmed competition.

154.   Defendants' conduct substantially affects interstate commerce by foreclosing and eliminating competition in the market for the tied product in the areas where Cablevision operates.  This lack of competition in this market has caused substantial anticompetitive effects, including higher prices for the tied product, lesser choice and dampened incentives to innovate.

155.   Plaintiffs and members of the Class have been damaged by Defendants' actions because they have been forced to spend more money for rental of the tied product than they would otherwise have spent for the purchase or rental of the tied product in a competitive market – i.e., a market

absent Defendants' illegal and anticompetitive conduct. Defendants have steadily and regularly increased the price of the tying product and have not offset the overcharge by reducing the price of the tied product.

156.   Defendants' tying arrangement unreasonably restrains trade in violation of Section 1 of the Sherman Act. Defendants' tying arrangement is a per se violation of Section 1, because (1) the tying and tied products are separate products; (2) Defendants conditioned the sale of the tying product on Class members' agreement to also rent the tied product exclusively from Cablevision; (3) Defendants possessed sufficient economic power in the tying product market to restrain competition in the tied market; and (4) the tying arrangement affected a substantial amount of interstate commerce.

157.   In the alternative, Defendants' tying arrangement violated Section 1 under the Rule of Reason, for the reasons set forth above. Moreover, the anticompetitive effects alleged above are quite substantial, as Cablevision has approximately 2.9 million subscribers of Two Way Services, who were forced to rent approximately six million cable set-top boxes exclusively from Cablevision at inflated prices. These anticompetitive effects substantially outweigh the pro-competitive benefits, if any, of Defendants' tying arrangement. Indeed, Plaintiffs assert that there are no legitimate pro-competitive benefits to Defendants' tying arrangements. If

there were any pro-competitive benefits to Defendants' conduct, they could have been accomplished through less restrictive means.

## COUNT II

**(By Plaintiffs, Individually And On Behalf Of All Members Of The Class, For Violation Of Section 2 Of The Sherman Act- Wrongfully Obtaining And Maintaining A Monopoly)**

158.   Plaintiffs hereby incorporate by reference the allegations in each of the foregoing Paragraphs.

159.   The Section 2 Relevant Market is the market for distribution of set-top boxes that can provide access to Two Way Services in the area in New York, New Jersey and Connecticut in which Cablevision operates (which falls entirely within the New York DMA).

160.   By engaging in the exclusionary conduct alleged above, Cablevision wrongfully acquired, enhanced and maintained a monopoly in the Section 2 Relevant Market. Cablevision effectively excludes all actual and potential competition in the Section 2 Relevant Market by blocking all set-top boxes other than those distributed by Cablevision and exclusively rented from Cablevision access to Two Way Services (even if those excluded boxes are the exact same make and model as Cablevision forces Two Way Service subscribers to rent).

161.   Cablevision achieved its monopoly in the Section 2 Relevant Market willfully and illegally. It did not achieve its monopoly by developing a better set-top box (since it does not develop set top boxes at all but uses the same make and models as many other cable operators use), but rather by artificially excluding and blocking competition from equivalent (or superior) set-top boxes that are otherwise capable of permitting access to Two Way Services.   This constitutes willful acquisition and maintenance of a monopoly in violation of Section 2 (and such conduct is in not excused to the extent that Cablevision has an internal corporate policy addressing its conduct).   The set-top boxes distributed by Cablevision use the same standard technology employed throughout the cable industry. Indeed, the third party that manufactures the set-top boxes distributed by Cablevision (Scientific Atlanta, a subsidiary of Cisco) sells substantially the same set-top box to other cable operators.

162.   The reason that set-top boxes obtained from a source other than Cablevision do not provide access to Two Way Services is not because those boxes lack the capacity to provide access but rather, boxes obtained from sources other than Cablevision are prevented by Cablevision from providing subscribers to Two Way Services with access to their Two Way Services due to Cablevision's willful exclusionary conduct, as alleged herein.

163.   Absent Cablevision's exclusionary conduct, a robust and competitive market distribution of set-top boxes providing access to Two Way Services would have developed. Absent such exclusionary conduct, there would have been substantial demand for competitively priced set-top boxes from sources or outlets other than Cablevision, and there would have been numerous manufacturers and retail outlets ready, willing and able to meet such consumer demand. Such a competitive market would have resulted in lower prices, greater choice and more innovation for consumers.

164.   As a result of Cablevision's exclusionary conduct as alleged herein, Cablevision willfully acquired and maintained a 100% share of the Section 2 Relevant Market throughout the Class Period.

165.   Absent Cablevision's exclusionary conduct as alleged herein, Plaintiffs and members of the Class would have paid substantially less for their set-top boxes capable of providing access to Two Way Services than they actually paid.

166.   The purpose and effect of Cablevision's conduct was to exclude competitors in the Section 2 Relevant Market.

167.   Cablevision had monopoly power in the Section 2 Relevant Market, in that Cablevision possessed the power to exclude competition and charge supra-competitive prices in that market. Cablevision's monopoly

power in this market is demonstrated by, *inter alia*, the fact that Cablevision was, in fact, successful in excluding all competition in that market, allowing it to charge and collect rental fees for set-top boxes that were far above the costs at which Plaintiffs and Class members would have been able to obtain such boxes absent Defendants' exclusionary conduct.

168.   Simply and directly, as a result of Cablevision's exclusionary conduct, set-top boxes distributed by any entity other than Cablevision are not viable alternatives to, nor reasonable substitutes for, the set-top boxes distributed by Cablevision, because Cablevision willfully and artificially excludes any set-top box other than those rented from Cablevision from accessing  Two Way Services (these excluded boxes include boxes of the exact same make and model as those that Cablevision forces subscribers of Two Way Services to rent from Cablevision only).

169.   Cablevision's conduct, as alleged herein, provided no pro-competitive effect or benefit to consumers. In contrast, Cablevision's exclusionary conduct caused enormous anticompetitive effects, including but not limited to hundreds of millions of dollars in aggregate overcharges that Class members were caused to incur on the rental of their set-top boxes from Cablevision.

170.  In addition, Cablevision's conduct reduced consumer choice and dampened incentives to innovate in the set-top box market.

171.  As a result of the foregoing, Defendants possess monopoly power in the Section 2 Relevant Market, and acquired, enhanced and maintained that monopoly power by use of exclusionary conduct, in violation of Section 2 of the Sherman Act. Such violations of Section 2 have caused injury to Plaintiffs and all other members of the Class in the form of overcharges, in violation of Section 4 of the Clayton Act.

## COUNT III

**(By Plaintiff Marchese, Individually, And On Behalf Of All Members Of The New Jersey Subclass For Violation Of The New Jersey Common Law Doctrine Of Unjust Enrichment)**

172.  Plaintiff Marchese repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

173.  Plaintiff Marchese and members of the New Jersey Subclass have paid (and continue to pay) for subscriptions to Two Way Services in the state of New Jersey.  Because their transactions occurred in the state of New Jersey, the New Jersey common law doctrine of unjust enrichment is applicable to the claims of Plaintiff Marchese and all members of the New Jersey Subclass pursuant to this Count.

174.   As demonstrated herein, at all relevant times, Defendants were unjustly enriched by (i) illegally tying subscriptions to Two Way Services to the rental exclusively from Defendants of cable set-top boxes that provide access to Two Way Services, and (ii) requiring Plaintiff Marchese and members of the New Jersey Subclass to rent the cable set-top boxes exclusively from Defendants.

175.   As a result of Defendants' actions, Plaintiff Marchese and members of the New Jersey Subclass have unknowingly conferred upon Defendants excessive payments for the rental of cable set-top boxes, benefits which were non-gratuitous and constituted "profits."

176.   Defendants retained these non-gratuitous and excessive benefits from Plaintiff and members of the New Jersey Subclass.  The retention of these benefits by the Defendants was unjust because Defendants accepted the payments with knowledge that the tying of Two Way Services to the exclusive rental from Cablevision of cable set-top boxes was unlawful.

177.   As a result of Defendants' scheme, Defendants reaped tens or hundreds of millions of dollars in illicit profits.

178.   The unjust and inequitable retention of these benefits by Defendants derived from their illegal tying arrangement violates the principles of justice and equity.   Therefore, Defendants must provide

restitution to Plaintiff and members of the New Jersey Subclass in a manner established by this Court.

## COUNT IV

**(By Plaintiff Fazio, Individually, And On Behalf Of All Members Of The Connecticut Subclass For Violation Of The Connecticut Common Law Doctrine Of Unjust Enrichment)**

179.   Plaintiff Fazio repeats and re-alleges each of the foregoing allegations  as if fully set forth herein.

180.   Plaintiff Fazio and members of the Connecticut Subclass have paid (and continue to pay) for subscriptions to Two Way Services in the state of Connecticut.   Because their transactions occurred in the state of Connecticut, the Connecticut common law doctrine of unjust enrichment is applicable to the claims of Plaintiff Fazio and all members of the Connecticut Subclass pursuant to this Count.

181.   As demonstrated herein, at all relevant times, Defendants were unjustly enriched by (i) illegally tying subscriptions to  Two Way Services to the rental exclusively from Defendants' of cable set-top boxes that provide access to Two Way Services, and (ii) requiring Plaintiff Fazio and members of the Connecticut Subclass to  rent the cable set-top boxes exclusively from Defendants.

182.   As a result of Defendants' actions, Plaintiff Fazio and members of the Connecticut Subclass have unknowingly conferred upon Defendants excessive payments for the rental of cable set-top boxes, benefits which were non-gratuitous and constituted "profits."

183.   Defendants retained these non-gratuitous and excessive benefits from Plaintiff and members of the Connecticut Subclass.  The retention of these benefits by the Defendants was unjust because Defendants accepted the payments with knowledge that the tying of Two Way Services to the exclusive rental of cable set-top boxes from Cablevision was unlawful.

184.   As a result of Defendants' scheme, Defendants reaped tens or hundreds of millions of dollars in illicit profits.

185.   The unjust and inequitable retention of these benefits by Defendants derived from their illegal tying arrangement violates the principles of justice and equity.   Therefore, Defendants must provide restitution to Plaintiff and members of the Connecticut Subclass in a manner established by this Court.

## COUNT V

**(By Plaintiffs Buono, Dapontes and Weinstein, Individually, And On Behalf Of All Members Of The New York Subclass For Violation Of The New York Common Law Doctrine Of Unjust Enrichment)**

186.   Plaintiffs Buono, Dapontes and Weinstein repeat and re-allege paragraphs above as if fully set forth herein.

187.   Plaintiffs Buono, Dapontes and Weinstein and members of the New York Subclass have paid (and continue to pay) for subscriptions to Two Way Services in the state of New York.  Because their transactions occurred in the state of New York, the New York common law doctrine of unjust enrichment is applicable to the claims of Plaintiffs Buono, Dapontes and Weinstein and all members of the New York Subclass pursuant to this Count.

188.   As demonstrated herein, at all relevant times, Defendants were unjustly enriched by (i) illegally tying subscriptions to Two Way Services to the  rental, exclusively from Defendants, of cable set-top boxes that provide access to Two Way Services, and (ii) requiring Plaintiffs Buono, Dapontes and Weinstein and members of the New York Subclass to  rent the cable set-top boxes exclusively from Defendants.

189.   As a result of Defendants' actions, Plaintiffs Buono, Dapontes and Weinstein and members of the New York Subclass have unknowingly

conferred upon Defendants excessive payments for the rental of cable set-top boxes, benefits which were non-gratuitous and constituted "profits."

190.   Defendants retained these non-gratuitous and excessive benefits from Plaintiff and members of the Connecticut Subclass.  The retention of these benefits by the Defendants was unjust because Defendants accepted the payments with knowledge that the tying of Two Way Services to the exclusive rental from Cablevision of cable set-top boxes was unlawful.

191.   As a result of Defendants' scheme, Defendants reaped tens or hundreds of millions of dollars in illicit profits.

192.   The unjust and inequitable retention of these benefits by Defendants derived from their illegal tying arrangement violates the principles of justice and equity.   Therefore, Defendants must provide restitution to Plaintiffs Buono, Dapontes and Weinstein and members of the New York Subclass in a manner established by this Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court:

a.   Certify this action as a class action under Rule 23, appoint Plaintiffs as representatives of the Class and subclasses alleged herein, and appoint the law firms representing Plaintiffs as Interim Co-Lead Counsel for the Class;

     b.     Issue an Order that Defendants have violated Sections 1 and 2 of the Sherman Act and Sections 4 of the Clayton Act, as alleged herein;

     c.     Order Defendants to pay Plaintiffs and members of the Class and subclasses treble damages and restitution in amounts to be determined at trial;

     d.     Issue an injunction preventing Defendants from continuing to tie Two Way Services to the rental exclusively from Cablevision of  cable set-top boxes;

     e.     Issue an order granting Plaintiffs' reasonable costs and attorneys' fees; and

     f.     Grant such other relief as may be just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

Dated: April 20, 2012

               By:   */s/ James V. Bashian*
                     **THE LAW OFFICES OF**
                     **JAMES V. BASHIAN, P.C.**
                     James V. Bashian, Esq.
                     70 Adams Street, 4th Floor
                     Hoboken, NJ 07030
                     Tel: 973-227-6330
                     Fax: 201-488-3330

**HORWITZ, HORWITZ &
PARADIS, Attorneys at Law**
Paul O. Paradis, Esq.
Gina M. Tufaro, Esq.
570 Seventh Avenue, 20st Floor
New York, NY 10018
Tel: 212-986-4500
Fax: 212-986-4501

**TAUS, CEBULASH & LANDAU,
LLP**
Barry S. Taus, Esq.
Brett Cebulash, Esq.
Kevin S. Landau, Esq.
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: 212-931-0704
Fax: 212-931-0703

**LAW OFFICES OF JAY P.
SALTZMAN**
Jay P. Saltzman, Esq.
110 Wall  St., 11th Floor
New York, NY 10005
Tel: 212-709-8323
Fax: 212-943-2300

**DEVERO TAUS, LLC**
David M. Taus, Esq.
211 Somerville Road, Suite B
Bedminster, NJ 07921
Tel: (908) 375-8142
Fax: (908) 375-8151